

RUSSELL J. FRACKMAN
GEORGE M. BORKOWSKI
JEFFREY D. GOLDMAN
MITCHELL, SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
(310) 312-2000

Attorneys for Defendants MCA Records, Inc., Universal Music International Ltd., Universal Music A/S, MCA Music Scandinavia AB, and Universal Music & Video Distribution, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>MCA RECORDS, INC, a California corporation, UNIVERSAL MUSIC INTERNATIONAL LTD., a British company, UNIVERSAL MUSIC A/S, a Danish business entity, MCA MUSIC SCANDINAVIA AB, a Swedish business entity, LOCOMOTION KOFOD SCHILLER FILM A/S, a Danish business entity, UNIVERSAL MUSIC & VIDEO DISTRIBUTION, INC., a New York corporation; and DOES 1-20,<br><br>Defendants. | CASE NO. 97-6791 WMB (RNBx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS MCA RECORDS, INC. AND UNIVERSAL MUSIC & VIDEO DISTRIBUTION, INC. IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION OF PLAINTIFF MATTEL, INC.**<br><br>Date: November 24, 1997<br>Time: 10:00 a.m.<br>Ctrm: Hon. William Matthew Byrne, Jr. |

ENTERED ON ICMS 11/5

25

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . 1

SUMMARY OF FACTS . . . . . . . . . . 4

A. Barbie As Icon . . . . . . . . . . 4

B. Barbie As Subject Of Commentary . . . . . . . . . . 5

C. Aqua's Reference To Barbie . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . 8

I. MATTEL'S TRADEMARK CLAIMS ARE WITHOUT MERIT . . . . . . . . . . 8

A. Mattel's Trademark Rights, If Any, Are Far More Limited Than It Asserts . . . . . . . . . . 8

B. Defendants' Use Of The Word "Barbie" To Express A Message Is Protected By The First Amendment . . . . . . . . . . 10

C. Defendants' Use Of The Word "Barbie" Does Not Designate Source And Thus Is Not A Trademark Use Governed By The Lanham Act . . . . 15

D. In Any Event, Defendants' Use Of The Term "Barbie" Is Fair Use . . . . . 16

E. Even Evaluated Apart From The First Amendment Issue, The Sleekcraft Factors Favor Defendants . . . . . . . . . . 18

II. MATTEL'S DILUTION CLAIMS ARE WITHOUT MERIT . . . . . . . . . . 25

III. MATTEL'S STATE LAW CLAIMS ARE MATERIALLY IDENTICAL TO ITS FEDERAL CLAIMS AND FAIL FOR THE SAME REASONS . . . . . . . . 31

IV. MATTEL HAS NOT SHOWN ANY OF THE PREREQUISITES NECESSARY TO JUSTIFY URGENT INJUNCTIVE RELIEF . . . . . . . . . . 31

A. Mattel Admits That Its Alleged Damages Are Calculable . . . . . . . . . . 32

B. Mattel's Delay Evidences The Lack Of Urgency Of The Relief It Seeks . . . . . . . . . . 32

C. The Balance Of Hardships Clearly Favors Defendants . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . 34

# TABLE OF AUTHORITIES

Page(s)

## CASES

AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) . . . . 18

Allied Artists Pictures Corp. v. Friedman, 68 Cal. App. 3d 127, 137 Cal. Rptr. 94 (1977) . . . . 18

Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863 (8th Cir. 1994) . . . . 9

August Storck K.G. v. Nabisco, Inc., 59 F.3d 616 (7th Cir. 1995) . . . . 32

Brunswick Corp. v. British Seagull Limited, 35 F.3d 1527 (Fed. Cir. 1994) . . . . 9

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994) . . . . 14

Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959 (10th Cir. 1996) . . . . 26, 30

Citibank, N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985) . . . . 32

City of Anaheim v. Kleppe, 590 F.2d 285 (9th Cir. 1978) . . . . 33

Cliff's Notes, Inc. v. Bantam Doubleday Dell Publishing Group, 886 F.2d 490 (2d Cir. 1989) . . . . 18

Coca-Cola Co. v. Gemini Rising, Inc., 346 F. Supp. 1183 (E.D.N.Y. 1972) . . . . 29

Consumers Union of United States, Inc. v. General Signal Corp., 724 F.2d 1044 (2d Cir. 1983) . . . . 18

Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2d Cir. 1979) . . . . 29

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . 23

Doeskin Products, Inc. v. Levinson, 132 F. Supp. 180 (S.D.N.Y. 1955) . . . . 10

Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394 (9th Cir. 1997) . . . . 14

# TABLE OF AUTHORITIES

Page(s)

## CASES (cont'd)

Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 924 F. Supp. 1559 (S.D. Cal. 1996) . . . . . 14, 25

Eastern Air Lines, Inc. v. New York Air Lines, Inc., 559 F. Supp. 1270 (S.D.N.Y. 1983) . . . . . 8

Eclipse Associates, Ltd. v. Data General Corp., 894 F.2d 1114 (9th Cir. 1990) . . . . . 18

Elvis Presley Enterprises, Inc. v. Capece, 950 F. Supp. 783 (S.D. Tex. 1996) . . . . . 19, 27, 28

Girl Scouts of the United States of America v. Bantam Doubleday Dell Publishing Group, 808 F. Supp. 1112 (S.D.N.Y. 1992) . . . . . 10

Girl Scouts v. Personality Posters Manufacturing Co., 304 F. Supp. 1228 (S.D.N.Y. 1969) . . . . . 20

Hormel Foods Corp. v. Jim Henson Productions, Inc., 36 U.S.P.Q. 2d 1812 (S.D.N.Y. 1995) . . . . . 19, 24, 30

Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541 (S.D.N.Y. 1991) . . . . . 24

In re R.M.J., 455 U.S. 191 (1982) . . . . . 18

John Lemmon Films, Inc. v. Atlantic Releasing Corp., 617 F. Supp. 992 (W.D. N.C. 1985) . . . . . 33

Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482 (10th Cir. 1987) . . . . . 25

Kellogg Co. v. National Biscuit Co., 305 U.S. 111 (1938) . . . . . 8

L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26 (1st Cir. 1987) . . . . . 26, 27, 31

Levi Strauss Co. v. Blue Bell, Inc., 778 F.2d 1352 (9th Cir. 1985) . . . . . 20

Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc., 65 F.3d 1063 (2d Cir. 1995) . . . . . 10

New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302 (9th Cir. 1992) . . . . . passim

# TABLE OF AUTHORITIES

Page(s)

## CASES (cont'd)

No Fear, Inc. v. Imagine Films, Inc., 930 F. Supp. 1381 (C.D. Cal. 1995) . . . . . 11, 12, 18

Norwich Pharmaceutical Co. v. Sterling Drug, Inc., 271 F.2d 569 (2d Cir. 1959) . . . . . 10

Ocean Bio-Chemical, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546 (S.D. Fla. 1990) . . . . . 10, 26

Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc., 642 F. Supp. 1031 (N.D. Ga. 1986) . . . . . 29

Pillsbury Co. v. Milky Way Productions, Inc., 215 U.S.P.Q. 124 (N.D. Ga. 1981) . . . . . 29

Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989) . . . . . passim

Schneider, Hill & Spangler, Inc. v. Cudmore, 325 F. Supp. 173 (D. Conn. 1971) . . . . . 31

Scott Paper Company v. Scott's Liquid Gold, Inc., 589 F.2d 1225 (3d Cir. 1978) . . . . . 22

Sunenblick v. Harrell, 895 F. Supp. 616 (S.D.N.Y. 1995) . . . . . 24

Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804 (9th Cir. 1963) . . . . . 31

Tomlin v. Walt Disney Productions, 18 Cal. App. 3d 226, 96 Cal. Rptr. 118 (1971) . . . . . 18

Toys 'R' Us v. Akkaoui, 1996 U.S. Dist. LEXIS 17090 (N.D. Cal. 1996) . . . . . 29

Victory Pipe Craftsmen, Inc. v. Faberge, Inc., 582 F. Supp. 551 (N.D. Ill. 1984) . . . . . 21, 22

WSM, Inc. v. Hilton, 724 F.2d 1320 (8th Cir. 1984) . . . . . 24

White v. Samsung America, 989 F.2d 1512 (9th Cir. 1993) . . . . . 13

Yankee Publishing Inc. v. News America Publishing Inc., 809 F. Supp. 267 (S.D.N.Y. 1992) . . . . . passim

## TABLE OF AUTHORITIES

Page(s)

STATUTES

15 U.S.C. § 1125(c) . . . . . . . . . . 25

Fed. R. Evid. 703 . . . . . . . . . . 23

MISCELLANEOUS

The Art of Barbie . . . . . . . . . . 4

Ebersole & Peabody, Mondo Barbie . . . . . . . . . . 4

R. Handler, Dream Doll . . . . . . . . . . 4

A. Kozinski, "Trademarks Unplugged," 68 N.Y.U. L. Rev. 960 (1993) . . . . . . . . . . 11

M. G. Lord, Forever Barbie, The Unauthorized Biography of a Real Doll . . . . . . . . . . 4

## INTRODUCTION[1]

The present motion of plaintiff Mattel, Inc. ("Mattel") presents the issue of whether one of the pop icons of American culture -- the Barbie doll -- can be commented on in a pop song or whether Mattel, under the guise of a trademark lawsuit, can silence or censor all discussion of the Barbie doll.

In March 1997, the Danish group, Aqua, released an album entitled Aquarium. The album became an immediate hit in Europe. One of the eleven songs on the album was entitled *Barbie Girl* -- a spoof directed to the "plastic" world of Barbie and Barbie-like people, inspired by a Copenhagen exhibition of cultural "kitsch" items from around the world. The song *Barbie Girl* was released as a single in Europe in May 1997, as the ***third*** single from the Aquarium album, following Aqua's two hit singles *My Oh My* and *Roses Are Red.*

Various U.S. radio stations began to play an imported version of the *Barbie Girl* single beginning four months ago, in June 1997. That was followed by a United States limited release of about 340,000 ***singles*** of the *Barbie Girl* recording on August 19, 1997, which sold out in one day, and the release of the Aquarium album containing *Barbie Girl* in the U.S. on September 9, 1997. To date, over 1.4 million compact discs and cassettes of the Aquarium album have been sold by the defendants to their customers in the United States.

Mattel's reaction to the *Barbie Girl* song, ***shortly after it was released*** in Europe, was captured in a recorded telephone interview of a Mattel executive on a Danish radio station, as follows:

"I think it is a funny song, and it isn't the first time that there is some artists, who have been inspired by Barbie . . . Barbie, by now, is a cultural icon on the whole western

---

[1] The evidence set forth in this memorandum is based upon the declarations of Søren Rasted, Bruce Wheeler, Harvey Geller, Richard Lanham, Valerie Folkes, and Jeffrey D. Goldman filed herewith.

world. I think it was about thirty years ago the Beach Boys made a song about Barbie and there have a been a few other songs about Barbie throughout the years. If there are such funny and good songs about Barbie, we're all for it."

See Declaration of Søren Rasted. Similarly, Mattel's vice-president for corporate communications recently reiterated that "[t]he reality is that Barbie has become a cultural icon and she has been adapted to all different aspects of society. We're a very diverse society -- Barbie respects that." Declaration of Jeffrey D. Goldman ("Goldman Decl.") Ex. 23.

Indeed, the Mattel representatives are correct. The *Barbie Girl* song is one of innumerable protectible First Amendment expressions, which spoof, parody, satirize, or comment on what Mattel, and other observers, call a cultural icon -- Barbie -- and all that she may be seen as representing.

Despite Mattel's initial positive response to *Barbie Girl*, now, many months later, it has changed its tune, and seeks to enjoin the defendants involved in the production, distribution and sale of the Aquarium album in the United States[2] and to stop the album in mid-stream, thereby irreparably harming not only the defendants, but the members of the Aqua band (who Mattel declined to sue).

This lawsuit is one of a series of misplaced lawsuits Mattel recently has filed claiming the same type of injury as a result of varied conduct by different defendants.[3] Notwithstanding Mattel's volley of litigation, and notwithstanding its

---

2 Mattel's motion has been brought only against the two domestic defendants, MCA Records, Inc. and Universal Music & Video Distribution, Inc. Three other European defendants, Universal Music International Ltd., Universal Music A/S, and MCA Music Scandinavia AB have accepted service and have answered the complaint. The remaining defendant, Locomotion Kofod Schiller Film A/S (which apparently made the video), has not yet been served.

3 Defendants request that the Court take judicial notice of Mattel's other pending lawsuits in this Court: Mattel, Inc. v. Nissan North America, Inc., CV 97-6955-DT, and Mattel, Inc. v. Barbara Miller, et al., CV 97-2173-ER. In each, Mattel claims to have been (continued...)

claimed harm, not even its own expert believes that it has been irreparably harmed by defendants' conduct here. And, notwithstanding Mattel's claim of dire consequences as a result of the conduct of the defendants here (and those defendants in the other cases), only last week Mattel reported record sales from the very same "core Barbie brand" products which it claims have been damaged.

Mattel's motion for a preliminary injunction (and indeed its entire lawsuit) based on allegations of trademark infringement and dilution fails for a variety of independent reasons:

- Defendants' right to comment upon and satirize a cultural icon such as Barbie is protected by the First Amendment. Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989).

- Defendants' use of the word "Barbie" does not implicate the trademark laws because defendants are not using the name to designate the source of its products.

- Defendants' reference to and use of the word "Barbie" is fair use. New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302, 305 (9th Cir. 1992).

- Mattel's "evidence" of likely consumer confusion -- a few ambiguous E-mails, one fax from the Middle East, and the conclusory, inadmissible declaration of its "expert" -- is grossly inadequate to support the extraordinary relief sought here.

- Mattel's dilution claims are without merit, both because defendants' use of the word "Barbie" is not "commercial" under dilution law and because the "G-rated" *Barbie Girl* is not lewd or degrading -- ***especially*** when compared with the many sexually explicit Barbie dolls and related materials that Mattel makes and licenses.

---

[3](...continued)
damaged and irreparably harmed by defendants' use of the Barbie name as the subject of a magazine (Miller), and the use of a doll -- ***not a Barbie doll*** -- in a television commercial (Nissan).

Mitchell, Silberberg & Knupp

♦ Mattel has met none of the prerequisites for injunctive relief: it delayed for many months before bringing this motion, its damages expert admits that damages are calculable, Mattel continues to report and publicize tremendous profits from its Barbie brand, and injunctive relief would devastate defendants while providing little benefit to Mattel.

## SUMMARY OF FACTS

### A. Barbie As Icon.

Barbie's genealogy is far from pristine. Over thirty years ago, Barbie began life as a knock-off of a German doll known as Lilli. Lilli was a "lascivious plaything for adult men based on a postwar comic character." M. G. Lord, Forever Barbie, The Unauthorized Biography of a Real Doll, at 9 (hereinafter "Lord") [Goldman Decl. Ex. 13]; see also R. Handler, Dream Doll, at 1-7 [Goldman Decl. Ex. 14]. Lilli was sold to men in tobacco shops as an adult toy novelty -- "sort of a three-dimensional pinup." Lord at 9.

After her importation into the United States by Mattel, Mattel itself marketed and promoted Barbie as a cultural symbol. Barbie has been associated by Mattel with all aspects of the culture, and indeed, has been made by Mattel into a part of the national fabric. Mattel has made Barbie a member of virtually every profession and race, and has associated her with, among others, Marilyn Monroe, Elvis Presley, and the Baywatch Babes. Mattel has linked Barbie with a myriad of products, including Harley Davidson motorcycles, and alcoholic beverages. Barbie has been, among other things, a homemaker and a biker; old-fashioned and modern; a rebel and a goddess; a dentist and Totally Hair Barbie.

Not only has Mattel, as noted above, characterized Barbie as an "icon," that status seems to be the most common description of Barbie. As one writer stated: "Barbie may be the most potent icon of American popular culture in the late twentieth century." Lord at 6. See also, e.g., Ebersole & Peabody, Mondo Barbie at xvi ("She is an American icon. The product of an adult fantasy of a girl-child's toy.") [Goldman Decl.

Ex. 16]; The Art of Barbie at 43 (Barbie as Icon) [Goldman Decl. Ex. 15]. See generally Declaration of Richard Lanham.

**B. Barbie As Subject Of Commentary.**

It is no surprise, given Barbie's history and varied background and associations, that she has come to symbolize different things to different people. For example, she has been seen as feminist and anti-feminist; as seductive and as wholesome; as intelligent and as a "dumb blond." Barbie has been hailed as a role model and condemned as the cause of eating disorders.

No surprise either is the fact that the effect of Barbie on girls and popular culture in general -- whether positive or negative -- has been debated at length. Barbie has at least one museum (unaffiliated with Mattel) devoted solely to her, and is a part of other museum collections. There are innumerable scholarly treatises, books, films, plays, entire magazines, articles, websites, paintings and pictures, cartoons -- indeed, many ***songs*** from established artists -- that evoke, and comment upon, Barbie and the doll's impact on or reflection of society:

> "Intense feelings about Barbie do not run exclusively toward love. For every mother who embraces Barbie as a traditional toy and eagerly introduces her daughter to the doll, there is another mother who tries to banish Barbie from the house. For every fluffy blond cheerleader who leaps breast-forward into an exaggerated gender role, there is a recovering bulimic who refuses to wear dresses and blames Barbie for her ordeal. For every collector to whom the amassing of Barbie objects is a language more exquisite than words, ***there is a fiction writer or poet or visual artist for whom Barbie is muse and metaphor -- and whose message concerns class inequities or the dark evanescence of childhood sexuality***." Lord at 6 (emphasis added).

The song *Barbie Girl* by Aqua is one of the numerous popular songs written about this symbol. The very issues the song discusses are the issues confronting not only the doll, but a "Barbie girl" in a "Barbie world" where life in "plastic, it's fantastic."[4] As a "Barbie Girl," Aqua's lead singer sings, "You can brush my hair/ Undress me everywhere/Imagination, life is your creation." Later she adds, "I'm a blond bimbo girl, in a fantasy world/Dress me up, make it tight, I'm your dolly." Similar comments on the Barbie world has been made in other popular songs. In 1995, rock artist Rick Monroe released a song called *Barbie's Got A Jones*, about an aging Barbie-like junkie:

> Prozac queen, always making the scene
> Using everyone you see
> With your C-class fame
> A burned-out blonde with a worn out frame
> ***You're living on fantasy*** . . .
> You had a nip and a tuck with a lift here and a suck
> Can you tell me, babe, ***is there anything left on you that's real***? (Emphasis added).

In 1992, folk singer Meryl Cadell, in her song *Barbie*, had a similar take on Barbie:

> Barbie lives in a ***plastic apartment***
> With her own elevator and phone
> Barbie's got a boyfriend with a suntan
> And whenever Ken phones, Barbie, she's home
> ***Malibu beach parties***, how come I never get to go
> Barbie, you got it all together
> How come you always know what to do

---

4 Defendants concurrently are lodging with the Court a copy of the Aquarium CD and *Barbie Girl* video to dispel Mattel's wildly exaggerated allegations about the nature of the video and of the song lyrics.

Barbie, you got it all together

I want to come and live with you . . . (Emphasis added.)

These are but two of many: see also, e.g., "More Beautiful Than Barbie," The Jesus Lizard (1996); "Bitterness Barbie," the Lunachicks (1995); "Barbie," David Wilcox (1995); "The Wreck of the Barbie Ferrari," John Hiatt (1993); "Twist Barbie," Shonen Knife (1992); "Barbie Doll Look," Sky Saxon (1989); "Snakes and Ladders," Joni Mitchell (1988) (concerning "the perfect girl . . . the perfect air-brushed angel" who is "like a Barbie doll"); "Kenbarbielove," Men Without Hats; "Young Americans," David Bowie ("Well it ain't that Barbie doll/Her heart's been broken just like you"). There is also a band called the "Naked Barbies" with two albums in release, a band called "Barbie & the Kens" that performs "Just A Gigolo," and an album in release by the Civil Tones that contains the song, "Sensible Shoes for Barbie."

**C. Aqua's Reference To Barbie.**

It is difficult to see how anyone could be confused by Aqua's reference to "Barbie" in *Barbie Girl* in a non-trademark sense, and in the same way it has been used innumerable times before in other works. Nor could anyone reasonably believe that defendants and Aqua intended to do anything other than that which was apparent to reviewers of the recording. For example, one newspaper discussed Aqua's work under the headline "AQUA POKES FUN AT ***ICON***" (emphasis added). Nor did the defendants or Aqua do anything to mislead or capitalize on the Barbie name:

- *Barbie Girl* is just one of eleven selections on the album.
- It is the third single on the album, released only after radios independently started to play the song from the album.
- It is not used in the title of the album or the name of the band, both of which are prominently displayed and have nothing to do with Barbie.
- The album is labeled with the MCA logo.

- The album artwork features a picture of the band. No one looks like a Barbie or Ken doll.
- No Barbie dolls of any type, no Mattel logo, nor anything that would indicate Mattel as a source is used.
- The only reference to Barbie on the album is as one of the eleven songs and on a traditional-type sticker in small print (and not in the pink color that Mattel seeks to monopolize) which simply states that the album includes the hit song *Barbie Girl*.
- It has a clear disclaimer (including an asterisk after the song title directing the purchaser to the disclaimer) stating: "The song *Barbie Girl* is a social comment and was not created or approved by the makers of the doll."

Try as it may, Mattel cannot turn a spoof of the Barbie icon into a trademark infringement, cannot censor criticism of Barbie -- whether light-hearted or heavy-handed -- and certainly cannot show entitlement to preliminary injunctive relief.

## ARGUMENT

### I. MATTEL'S TRADEMARK CLAIMS ARE WITHOUT MERIT.

#### A. Mattel's Trademark Rights, If Any, Are Far More Limited Than It Asserts.

Mattel suggests that it has an absolute right to control any reference to "Barbie," and in particular any use of the word in conjunction with the color pink, even in a work of artistic expression. Mattel grossly overstates the scope of its trademark rights.

Even if the term "Barbie" remains a valid trademark owned by Mattel,[5]

---

[5] The term "Barbie doll" has come to describe an entire genre of doll -- an 11 1/2 inch fashionably dressed teenager with certain anatomical characteristics. If necessary, defendants intend ultimately to prove that the term "Barbie doll" has therefore become generic and is outside the purview of the trademark laws. See, e.g., Kellogg Co. v.

(continued...)

Mitchell, Silberberg & Knupp

Mattel's rights to prevent use of the term by others is circumscribed by the purpose and scope of trademark law. The purpose of trademarks has "remained constant and limited: Identification of the manufacturer or sponsor of a good or the provider of a service." New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302, 305 (9th Cir. 1992). Thus, "nominative use of a mark -- where the only word reasonably available to describe a particular thing is pressed into service -- lies outside the strictures of trademark law . . . " Id. at 308. "For example, one might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls. In such cases, use of the trademark does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source." Id. at 306. Moreover, "when unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right." Yankee Publishing Inc. v. News America Publishing Inc., 809 F. Supp. 267, 276 (S.D.N.Y. 1992).

Mattel also obliquely claims that it has undefined "trade dress" rights that defendants somehow have infringed. As best defendants can tell, Mattel's claim that it has some sort of (unregistered) proprietary right in the color pink when used in conjunction with the name "Barbie" (or in conjunction with white). This contention is frivolous. The color pink connotes femininity, is traditionally associated with young girls and dolls, and is used by many manufacturers of toys and other products for young girls in order to make their products desirable. Indeed, ***Mattel itself*** uses the color for dolls unrelated to Barbie. It is well-established that a color that has aesthetic functionality cannot serve as a trademark; Mattel does not have a monopoly on the color pink for dolls or toys (let alone ***records***). See, e.g., Brunswick Corp. v. British

---

[5](...continued)
National Biscuit Co., 305 U.S. 111 (1938) ("shredded wheat" was generic); Eastern Air Lines, Inc. v. New York Air Lines, Inc., 559 F. Supp. 1270 (S.D.N.Y. 1983) ("air-shuttle"). However, the Court need not reach this issue here.

Seagull Limited, 35 F.3d 1527, 1530 (Fed. Cir. 1994) (no trademark in color black for outboard motors because "black is more desirable from the perspective of prospective purchasers"), cert. denied, 514 U.S. 1050 (1995); Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 874 (8th Cir. 1994) (no protection for red and green packaging for Christmas products "because such colors are traditionally used for products relating to Christmas"); Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc., 65 F.3d 1063, 1071 (2d Cir. 1995) (color black for makeup compacts did not "distinguish Mana's compacts from its competitors . . . [T]here are countless numbers of cosmetic companies that sell black compacts."); Norwich Pharmaceutical Co. v. Sterling Drug, Inc., 271 F.2d 569, 572 (2d Cir. 1959) (no protection in Pepto-Bismol's pink color which was "designed to present a pleasing appearance to the customer"), cert. denied, 362 U.S. 919 (1960); Doeskin Products, Inc. v. Levinson, 132 F. Supp. 180, 184 (S.D.N.Y. 1955) (no protection for pink or peach color for box of facial tissues because "the use of pastel shades in the packaging and merchandising of facial tissues is common and widespread" to create an impression of softness). In any event, defendants' extremely limited use of pink on its almost entirely ***blue*** record would not infringe Mattel's monopoly on pink, even if it had one.

**B. Defendants' Use Of The Word "Barbie" To Express A Message Is Protected By The First Amendment.**

Any enforceable trademark right possessed by Mattel could not permit Mattel to monopolize and control public comment and artistic expression regarding Barbie dolls. "The owner of a trademark does not possess a property right that is superior to the First Amendment right accorded to artistic expression." Girl Scouts of the United States of America v. Bantam Doubleday Dell Publishing Group, 808 F. Supp. 1112, 1118 (S.D.N.Y. 1992), aff'd, 996 F.2d 1477 (2d Cir. 1993). "To prevent filmmakers, novelists, painters, and political satirists from including trademarks in their works is to cordon off an important part of modern culture from public discourse." Id. at 1119 (citation omitted). Thus, "[w]hen first amendment values are involved, the Lanham Act

must be construed narrowly." Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546, 1553 (S.D. Fla. 1990). As recently written by Judge Kozinski:

> "[O]ur vision of the world and of ourselves is shaped by the words we use and by the images that fill our fantasies. The words and images of trade are an important part of this panorama. What starts out as a trademark or slogan quickly spills over into a political campaign, a Saturday Night Live skit, a metaphor, a cultural phenomenon, an everyday expression -- and occasionally a fixed part of the language. . . . The originator of a trademark or logo cannot simply assert, 'It's mine, I own it, and you have to pay for it any time you use it.' ***Words and images do not worm their way into our discourse by accident; they're generally thrust there by well-orchestrated campaigns intended to burn them into our collective consciousness. Having embarked on that endeavor, the originator of the symbol necessarily -- and justly -- must give up some measure of control.*** The originator must understand that the mark or symbol or image is no longer entirely its own, and that in some sense it also belongs to all those other minds who have received and integrated it." A. Kozinski, "Trademarks Unplugged," 68 N.Y.U. L. Rev. 960, 974-75 (1993) (emphasis added).

In this District, claims under the Lanham Act brought against titles to artistic works must be evaluated under the standard articulated in Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989) and its progeny. No Fear, Inc. v. Imagine Films, Inc., 930 F. Supp. 1381, 1382-83 (C.D. Cal. 1995) (pursuant to Rogers, plaintiff's showing of likelihood of confusion "must be particularly compelling to overcome the constitutional protection afforded expressive activity."). The Rogers Court held that Lanham Act

claims against the title of an artistic work must be subjected to a very stringent balancing test:

> "Movies, plays, books, and songs are all indisputably works of artistic expression and deserve protection. . . . We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest of freedom of expression. In the content of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic reference to the underlying work whatsoever, or, if it has some artistic relevance, unless the title ***explicitly misleads*** as to the source or the content of the work." Id. at 997, 999 (emphasis added).

Subsequent courts have expanded the scope of Rogers to include numerous other areas of expressive conduct, including specifically the use of marks in the titles of artistic works generally. No Fear, 930 F. Supp. at 1382 n.2.

In Rogers, the defendants produced and distributed a film called "Ginger and Fred," which told the fictional story of two Italian cabaret performers who, in their heyday, imitated Ginger Rogers and Fred Astaire and became known in Italy as "Ginger and Fred." 875 F.2d at 996-97. Ginger Rogers sued, alleging that defendants' created the false impression that she sponsored, endorsed, or otherwise was involved in the film. Id. at 997. The Court concluded that unless the title of an artistic work gave an "overt indication of authorship or endorsement," the Lanham Act would not be applicable:

> "Many titles . . . include a well-known name without any overt indication of authorship or endorsement -- for example, the hit song 'Bette Davis Eyes,' and the recent film "Come

Back to the Five and Dime, Jimmy Dean, Jimmy Dean.' To some people, these titles might implicitly suggest that the named celebrity had endorsed the work or had a role in producing it. Even if that suggestion is false, the title is artistically relevant to the work. ***In these circumstances, the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and the Lanham Act is not applicable.***" 875 F.2d at 999-1000 (emphasis added).

In part because the public is used to hearing and seeing product names in this context, the risk of any confusion is very small. The use of well-known trademarks as the subject of and in the titles of songs, films, plays, and books is longstanding and widespread. See, e.g., Janis Joplin, "Mercedez Benz" (1971); Paul Simon, "Kodachrome" (1973); Leonard Cohen, "Chelsea Hotel" (1975); Bruce Springsteen, "Cadillac Ranch" (1980); Prince, "Little Red Corvette" (1982); dada, "Dizz Knee Land" (1992) ("I just robbed a grocery store -- I'm going to Disneyland"); Monty Python, "Spam" (1988); Roy Clark, "Thank God and Greyhound" (1979); Mel Tillis, "Coca-Cola Cowboy (1981); Truman Capote, "Breakfast at Tiffany's" (1958); Kurt Vonnegut, Jr., "The Breakfast of Champions" (1973); Tom Wolfe, "The Electric Kool-Aid Acid Test (1968); Larry Niven, "Man of Steel, Woman of Kleenex, in All the Myriad Ways" (1971); "Looking for Mr. Goodbar" (1977); "The Coca-Cola Kid " (1985); the Kentucky Fried Movie (1977); Harley Davidson and the Marlboro Man (1991); Tim Rice & Andrew Lloyd Webber, "Joseph and the Amazing Technicolor Dream Coat." As Judge Kozinski stated in his dissent from denial of request for rehearing en banc in White v. Samsung America, 989 F.2d 1512 (9th Cir. 1993), "[t]he creators of some of these works might have gotten permission from the trademark owners, though it's unlikely Kool-Aid relished being connected with LSD, Hershey with homicidal maniacs, Disney with armed robbers, or Coca-Cola with

cultural imperialism. ***Certainly no free society can demand that artists get such permission.***" 989 F.2d at 1512 n.6 (emphasis added).

Indeed, as set forth on pages 6-7 supra, "Barbie" itself has been used in the titles of, and as the subject matter of, numerous songs and even groups themselves to refer specifically to Mattel's doll. Writing songs about Barbie is nothing new. It is free expression, not trademark infringement.

In an attempt to sidestep this issue, Mattel misleadingly cites Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394 (9th Cir. 1997) for the proposition that "the Lanham Act is content-neutral and affords no protection to confusing uses of protected trademarks under the guise of free speech." Motion at 21. In fact, the distinction drawn in Dr. Seuss clearly supports ***defendants'*** position. Dr. Seuss stands for the proposition that the defense of parody applies where the defendants are commenting on or parodying the original work itself, rather than just appropriating it for unrelated purposes as in Dr. Seuss. The parody defense was unavailable to the defendants in Dr. Seuss because they simply appropriated the trademarked style of author Theodore Geisel to create a work ***about an entirely different and unrelated subject***: the O.J. Simpson murder trial. The defendants were not commenting on or parodying Dr. Seuss or Mr. Geisel; they were parodying the Simpson trial. The Court found that the defendants' "likely intent in selecting the Seuss marks was to draw consumer attention to what would otherwise be just one more book ***on the O.J. Simpson murder trial.***" 109 F.3d at 1405 (emphasis added).[6] The Dr. Seuss district court, which the Ninth Circuit affirmed, made this distinction clear. Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 924 F. Supp. 1559, 1573 n.21 (S.D. Cal. 1996) (Dr. Seuss' trademark rights "would bow to the public's interest in free

---

6 The same principle applies in copyright law. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994) (critical issue in determining whether parody is fair use is whether parodist is commenting on the "substance or style of the original" or merely using the original "to get attention or to avoid the drudgery of working up something fresh.").

dissemination of ideas ***where a speaker sought to criticize the trademark itself.***") (emphasis added). Here, of course, unlike in Dr. Seuss, the song *Barbie Girl* directly spoofs and comments upon the Barbie doll and its influence. Thus, as the Dr. Seuss District Court put it, Mattel's trademark rights must "bow to the public's interest in free dissemination of ideas."

**C. Defendants' Use Of The Word "Barbie" Does Not Designate Source And Thus Is Not A Trademark Use Governed By The Lanham Act.**

Even aside from the First Amendment, defendants' use of the word "Barbie" cannot be actionable because it is not a trademark use -- that is, it does not designate source. The title of one song does not designate the source of the song or the album on which it appears -- the source of the song is the artist (here Aqua) and the record company (here MCA Records).[7] Aqua's Aquarium album contains 11 songs; other than *Barbie Girl*, all of the songs relate to subjects entirely unrelated to Barbie. No reasonable consumer would believe that Aquarium was sponsored by Mattel on the basis that ***one*** of the many songs on the album has the word "Barbie" in its title and pokes good-natured fun at one of Mattel's products. New Kids, 971 F.2d at 305 (trademark laws only apply to "[i]dentification of the manufacturer or sponsor of a good or the provider of a service."); Yankee Publishing, 809 F. Supp. at 273 ("If the context or manner of the use does not suggest that the trademark is being used to indicate source or origin of publication, there will be no consumer confusion.").

Mattel's contention that "[s]hort titles function solely as designators of the origin of products, not as embodiments of creative expression" (Motion at 21) is totally unsupported and incorrect. Mattel intentionally confuses the names of ordinary commercial products with the name of an artistic work. Unlike the brand name of a vacuum cleaner or toothbrush, the title of an artistic work says little about its origin --

---

[7] This is true of other artistic works. Consumers obviously look for the name of the author of a book or play, or the painter of a painting, to determine the source of such works, rather than the title of the work.

Mitchell, Silberberg & Knupp

as consumers are well aware. Rogers, 875 F.2d at 1000 (consumers "do not regard titles of artistic works in the same way as the names of ordinary commercial products. . . . [M]ost consumers are well aware that they cannot judge a book solely by its title any more than by its cover.").

D. **In Any Event, Defendants' Use Of The Term "Barbie" Is Fair Use.**

Even if defendants' had used the term "Barbie" to designate source (which they did not), and even if their reference to "Barbie" was not protected by the First Amendment (which it is), the reference to "Barbie" would constitute fair use as a matter of law, pursuant to the test established by the Ninth Circuit in New Kids, supra. A principal underlying message of *Barbie Girl* -- having to do with the vacuous, "plastic," and frivolous lifestyle suggested by the doll and all of her possessions -- simply could not be made nearly as effectively without evoking the Barbie doll iconography specifically and all it has come to represent. Precisely because the Barbie doll is so well-known, it has come to represent a set of cultural values, sometimes inconsistent, and frequently is the subject of public comment and debate. See page __ supra. For this reason, the use of the term "Barbie" as a cultural reference constitutes fair use pursuant to New Kids:

> "With many well-known trademarks, such as Jell-O, Scotch tape and Kleenex, there are equally informative non-trademark words describing the products (gelatin, cellophane tape and facial tissue). ***But sometimes there is no descriptive substitute***, and a problem closely related to genericity and descriptiveness is presented when many goods and services are effectively identifiable only by their trademarks. . . . Indeed, it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark. . . . ***Much useful social and commercial discourse would be all***

> ***but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.***"

New Kids, 971 F.2d at 306-07 (emphasis added). In New Kids, the Ninth Circuit established a three-part fair use test:

> "[W]here the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." New Kids, 971 F.2d at 308.

Here, all three of these elements are met. First, there is no reasonable way to refer to a Barbie doll and all it has come to represent without using the word "Barbie."

Second, defendants only used what was reasonably necessary to identify the product: the word "Barbie". Defendants did not use the Barbie logo, a picture of Barbie or any Barbie dolls; the band members are not dressed to look like Barbie or Ken in the video or on the album cover, and look nothing like them. See New Kids, 971 F.2d at 308 (second element met where defendants "do not use the New Kids' distinctive logo or anything else that isn't needed to make the announcements intelligible to readers.").

Third, defendants have done nothing to suggest sponsorship or endorsement by Mattel. To the contrary, defendants used their own album title, group

name, and company name. The title *Barbie Girl* was used for one purpose and one purpose only -- as the name of a single song. Defendants also placed a prominent disclaimer on the record, in direct proximity to and in the same color as the list of songs where *Barbie Girl* is identified, expressly stating that "The song *Barbie Girl* is a social comment and was not created or approved by the makers of the doll." Such disclaimers "are a favored way of alleviating consumer confusion as to source or sponsorship. . . . Absolute prohibitions of speech . . . are improper where there is any possibility that an explanation or disclaimer will suffice." Consumers Union of United States, Inc. v. General Signal Corp., 724 F.2d 1044, 1053 (2d Cir. 1983), cert. denied, 469 U.S. 823 (1984), citing In re R.M.J., 455 U.S. 191, 203 (1982); see also Allied Artists Pictures Corp. v. Friedman, 68 Cal. App. 3d 127, 136, 137 Cal. Rptr. 94 (1977) (where title of artistic work is at issue, disclaimer is extent of relief court may grant); Tomlin v. Walt Disney Productions, 18 Cal. App. 3d 226, 235, 96 Cal. Rptr. 118 (1971) (injunctive relief in such a case must be limited to "appropriate precautions to prevent public confusion and cannot totally prevent the use of a title.").

**E. Even Evaluated Apart From The First Amendment Issue, the Sleekcraft Factors Favor Defendants.**

Ordinarily, trademark infringement claims are evaluated under the eight-part test of AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979). In this case, the Sleekcraft factors provide scant guidance because of the unusual nature of Mattel's claim and the First Amendment implications of that claim. See Eclipse Associates, Ltd. v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990) (Sleekcraft factors are simply "helpful guidelines . . . not meant to be requirements or hoops that a district court need jump through to make the determination."). To the extent the Sleekcraft factors are to be used at all here, it is established that "[p]laintiff's showing under Sleekcraft must be ***particularly compelling*** to overcome the constitutional protection afforded expressive activity." No Fear, 930 F. Supp. at 1384 (emphasis added); see also Cliff's Notes, Inc. v. Bantam Doubleday Dell Publishing Group, 886 F.2d 490, 494-95 (2d Cir. 1989)

("somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression."). Mattel has not come close to meeting its heavy burden.

**Strength of the mark.** To the extent it has not become generic, the Barbie mark is undeniably strong for ***dolls*** and doll-related products. But defendants have not made a doll -- they have made a record. Try as it might, Mattel has not established (as it must) that Barbie is well-known as a mark for records or even other music-related products. ***Of all of the trademark registrations referred to by Mattel (Motion at 4), not a single one applies to records or tapes.*** Among the many hundreds of Barbie products marketed or licensed by Mattel, Mattel has only been able to identify a few allegedly music-related products sold at some unspecified time in the past -- and has had to greatly stretch the definition of "music-related" even to identify these. Thus, Mattel claims that such products as a "miniature music store playset" and "four miniature play areas, including a stage and disk jockey area, to be used with the BARBIE line of dolls" are "music-related" (McKenzie Decl. ¶ 12) even though they are mere toys and do not have anything to do with ***real*** music or ***real*** records. Mattel's own revenue numbers do not list a single license for a single record product. Indeed, its own definition of its "core product" is dolls.

Moreover, under the unique circumstances presented here, even if the focus were on dolls and doll-related products, the very strength of Mattel's Barbie mark in that context actually ***decreases*** the likelihood of confusion. Yankee Publishing, 809 F. Supp. at 273 ("In the usual trademark infringement case, a strong mark is held to favor plaintiffs. Where the plaintiff's mark is being used as part of a jest or commentary, the opposite can be true. It is precisely because both plaintiffs' and defendant's marks are strong . . . that confusion is avoided in this case."); Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 503 (2d Cir. 1996) (in the context of a parody, the "strength of [plaintiff's] mark" "weigh[s] strongly against the likelihood of confusion as to source or sponsorship"); Elvis Presley Enterprises, Inc. v. Capece, 950 F. Supp. 783,

792 (S.D. Tex. 1996) ("Confusion is avoided when the defendant uses the plaintiff's mark as a part of a parody, jest, or societal commentary.").[8]

**Proximity of the marks.** Mattel's Barbie products are primarily dolls and doll-related products. Obviously, no consumer interested in purchasing a Barbie doll would visit a ***record*** store in the first place, let alone purchase the Aquarium album by mistake. When Mattel's own expert decided to buy the Aqua album, he went directly to a record store -- the Wherehouse -- "because they sell music" (Deposition of Weston Anson ("Anson Depo.") at 95 [Goldman Decl. Ex. 24]).

Even focusing on the few Barbie records allegedly sold by Mattel over a 35-year period, Mattel has not contended (let alone proven) that it presently markets any such Barbie recordings in ***record*** stores, nor that defendants sell *Barbie Girl* in toy stores. It is fundamental that "[a] buyer cannot . . . be confused unless he is looking for a label he recognizes and picks up another in his confusion." Levi Strauss Co. v. Blue Bell, Inc., 778 F.2d 1352, 1359 (9th Cir. 1985). Thus, what Mattel must show (but has not and cannot) is that there is a significant body of consumers interested in hypothetical "Barbie" recordings made by Mattel who visit record stores and erroneously purchase Aquarium, believing it is made by Mattel (even though the packaging does not identify Mattel, contains a disclaimer, and expressly identifies MCA Records and Aqua as the source of the album). Needless to say, Mattel has not and cannot make such a showing.

**Similarity of the marks.** Defendants have used the ***word*** "Barbie", as they are permitted to do under the First Amendment, but otherwise there is no similarity whatsoever to Mattel's Barbie mark. Mattel's Barbie mark ordinarily appears in a

---

8 Indeed, if *Barbie Girl* were as salacious as Mattel claims it is, this too would militate against the likelihood that consumers would confuse it with Mattel's allegedly wholesome Barbie dolls and other products. Girl Scouts v. Personality Posters Mfg. Co., 304 F. Supp. 1228 (S.D.N.Y. 1969) ("rational analysis of the situation does not indicate a likelihood that the public will believe that the Girl Scouts are the authors of the poster [of a pregnant Girl Scout] to which they understandably take such violent exception.").

distinctive near-cursive script in white, followed by the letters "TM", either alone or in conjunction with a particular toy (e.g. "Barbie's Dream House"). So far as defendants are aware, it is never used as a title in conjunction with the word "Girl". By contrast, on the Aquarium album, the title *Barbie Girl* is in small block lettering (entirely dissimilar to Mattel's Barbie logo) on the back of the package, on a field of blue, listed along with ten other songs that have nothing to do with Barbie. The small sticker affixed to some of the compact discs is not in pink and has no similarity to the Barbie logo either. Even on the single (which is no longer being made or sold by defendants), the words "Barbie Girl" (again in block lettering on a field of blue) on the front of the packaging are dwarfed by the word "Aqua". Other than the word "Barbie", there is no similarity whatsoever between Mattel's trademark or trade dress and defendants' record.

**Evidence of actual confusion.** Mattel has presented virtually no evidence of actual confusion -- even though both Barbie dolls and the song *Barbie Girl* are enormously popular and substantial evidence of actual confusion presumably would be available if there were any basis for it. Further, notwithstanding the fact that there was ample time to do so, Mattel has not undertaken a survey, which is "generally considered the best evidence of actual confusion." Victory Pipe Craftsmen, Inc. v. Faberge, Inc., 582 F. Supp. 551, 558 (N.D. Ill. 1984).

Mattel's "evidence" consists of a few anonymous E-mails and one letter, indicating that, out of the many millions of purchasers of Mattel's and defendant's products, at most a handful of people may not be entirely certain of its origin or of Mattel's position.[9] This evidence is inadmissible and, in any event, is clearly not

---

[9] Even if the few letters and e-mails Mattel received were admissible, they hardly evidence much confusion. Of the seven e-mails and one fax cited by Mattel, the only one that evidences any overt confusion is from a friend of Mattel Senior Vice-President Jean McKenzie who lives in the ***United Arab Emirates***. Of the remaining seven e-mails, two simply quote lyrics from the song with no explanation; one states that the writer "loves" the song; one congratulates "Barbie and Ken and Aqua" on the success of the song; two ask whether Mattel could add the song to its website so it could be downloaded; and one asks if Mattel can send the writer a copy of the song.

(continued...)

enough to justify the draconian remedy of a preliminary injunction. Victory Pipe, 582 F. Supp. at 558 ("isolated or minor instances of actual confusion do not support a finding of likelihood of confusion. . . . [L]etters and affidavits from individuals who are not available for cross-examination are generally inadmissible, and hearsay reports with respect to the likelihood of confusion, especially those originating with employees of the plaintiff, are incompetent as evidence."); Scott Paper Company v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978) (evidence of 19 misdirected letters was "extremely minimal" and "insufficient to determine that injunctive relief is appropriate."); see also Rogers, 875 F.2d at 1001 (summary judgment for defendant where "survey evidence" indicates "at most that some members of the public would draw the incorrect inference that [plaintiff] had some involvement" with the artistic work, because "that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act."). Here, over two million people have purchased the album and countless more have heard *Barbie Girl* performed. Yet, Mattel has received but a handful of ambiguous comments, and defendants have not received ***any*** communications from the public indicating confusion regarding the source of *Barbie Girl.*

On the issue of confusion, Mattel also offers the "expert" declaration of Anson, which consists entirely of Anson's unsupported conclusions. See Defendants' Motion to Strike and Evidentiary Objections (filed herewith). Anson, who admittedly has no experience or expertise in the music industry, asserts that his conclusions are

---

[9](...continued)
Erroneously believing that Mattel could obtain permission to send out or upload copies of the song is not the same as believing Mattel sponsored it. Even though McKenzie acknowledged in her declaration that "Mattel can respond to individual correspondence as they receive them" (¶ 19), she and proffered expert witness Weston Anson both admitted at their depositions that Mattel has not even bothered to contact these few writers to find out the extent of or reason for their possible confusion, or to attempt to dispel any confusion that may exist. Anson Depo. 170-71 [Goldman Decl. Ex. 24]; Deposition of Jean McKenzie 148-49 [Goldman Decl. Ex. 25].

based upon his review of various unidentified internal Mattel documents and interviews with "Mattel marketing and licensing managers." Declaration of Weston Anson ("Anson Decl.") ¶ 4. Anson says the "conclusions set forth in this declaration are based on facts gleaned from these materials and interviews" (id.), although he does not specify ***any*** of these supposed facts. Apparently based on these unspecified "facts" obtained solely from Mattel employees, Anson then filled out a chart that he invented and calls the "VALMATRIX" (which is not recognized by any Court or professional literature), using a "proprietary scoring technique," the parameters of which he does not reveal and which apparently do not exist. Anson Decl. ¶ 36. Anson proclaims that the "score" he obtains using this secret technique "tells the court and ourselves whether or not confusion occurs." Anson Decl. ¶ 36. One could scarcely imagine "expert" testimony less grounded in science ***or*** facts than Anson's. See Fed. R. Evid. 703; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-90 (1993); see also cases cited in Motion to Strike (filed herewith). At least one judge of this Court has had prior experience with Anson and his VALMATRIX. In 1995, Judge Gadbois issued an order in No Fear, Inc. v. Imagine Films, Inc., CV 6414 RG, referring to Anson and his Valmatrix report as follows:

> "[T]he VALMATRIX report presented by the plaintiff is unsupported by any factual or empirical bases for its confusion calculations and may be so devoid of probative value as to be excludable under F.R.E. 703 . . . Indeed, the basis for the calculus of the VALMATRIX report is conclusory and vague at best." Order filed March 27, 1995, at 4 and n.2.

Finally, even using Anson's subjective, result-oriented "method," Anson's opinion is that any confusion here does ***not*** rise to the level of "irreparable" on the Anson scale! Anson Decl. Ex. F.

**Marketing channels used.** As noted above, Mattel has not even contended that it sells Barbie dolls (or even Barbie records) in ***record*** stores, nor that defendants sell the Aquarium album in toy stores. Moreover, defendants have primarily

advertised *Barbie Girl* where Mattel does not advertise and directed their advertising to a different, older demographic target: in the alternative press (the readership of which tends to patronize dance clubs where the song is played), the record trade press, record store "co-op" advertising, and by providing copies of the song to radio stations (on which there is no evidence Mattel advertises Barbie) and of the video to video networks, such as VH1 and the Box, on which Mattel does not advertise Barbie. Barbie doll products are targeted to a very young audience (3- to 10-year-olds). Mattel products are marketed in their own catalogs, and magazines devoted to toys generally, or Barbie dolls specifically. The Aquarium album is targeted to teenagers and above.

**Type of goods and the degree of care likely to be exercised by the purchaser.** Purchasers of the Aquarium album, or of the *Barbie Girl* single when it was briefly available, are driven by their interest in the group (which had two hit songs in Europe prior to *Barbie Girl*) or in the music itself, not because they erroneously believe the song is a doll-related product. As many courts have recognized, "buyers of musical recordings are relatively sophisticated consumers whose purchasing decisions are driven by a recognition of and search for a particular artist or composition . . . " Sunenblick v. Harrell, 895 F. Supp. 616, 634 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir. 1996); see also Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 568 (S.D.N.Y. 1991) ("It seems fair to assume that the sophistication of consumers of rap music, who are relatively young and of all racial groups, is high in respect of the purchasing choices they make concerning such product."); WSM, Inc. v. Hilton, 724 F.2d 1320, 1330 (8th Cir. 1984) ("the country music audience is a sophisticated one").

**Defendant's intent in selecting the mark.** Defendants intended to evoke, and poke fun at, Barbie's image, not to cause consumer confusion (which would in fact be counterproductive to defendants' primary goal of establishing Aqua as a group). See Hormel Foods Corp. v. Jim Henson Productions, Inc., 36 U.S.P.Q.2d 1812, 1818-19 (S.D.N.Y. 1995) ("Henson acknowledges that it meant to invoke Hormel's trademark as a joke. This does not mean that Henson intended to cause confusion in the minds of

consumers."), aff'd, 73 F.3d 497 (2d Cir. 1996); Yankee Publishing, 809 F. Supp. at 275 ("the intentional use by [defendant] of an imitation of [plaintiff's] trade dress was for the purpose of comic commentary, and not for any of the purposes that are forbidden or distinguished by the trademark law."). To the contrary, the song is intended as a commentary on Barbie's influence on society and thus, to be properly understood, depends on consumers understanding that it is ***not*** endorsed by Mattel -- which the lyrics and obviously tongue-in-cheek video make abundantly clear. Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1486 (10th Cir. 1987) ("The benefit to the one making the parody . . . arises from the humorous association, not from public confusion as to the source of the marks.").

**Likelihood of expansion of the product lines.** Defendants do not have a *Barbie Girl* ***product line*** at all (notwithstanding Mattel's disingenuous references to defendants' "BARBIE GIRL products"). *Barbie Girl* is one song on an album of 11 songs entitled Aquarium by the group Aqua. Other than this one song, nothing about Aqua's album or live performances have any relationship to, or do anything to evoke, Barbie. Indeed, the success of *Barbie Girl* took Aqua by surprise. If no injunction is issued and the band thereby is permitted to continue expanding its popularity, it will release other songs unrelated to Barbie, and future albums that will present new songs unrelated to Barbie. Thus, there is no *Barbie Girl* product line and, by definition, no chance of expansion of any such line.

## II. MATTEL'S DILUTION CLAIMS ARE WITHOUT MERIT.

Mattel also seeks relief under anti-dilution statutes, claiming that *Barbie Girl* is tarnishing the image of Barbie dolls. This claim fails for several independent reasons. As an initial matter, Mattel's claim under the federal anti-dilution statute, 15 U.S.C. § 1125(c), fails because the statute contains an ***express*** exception for "noncommercial use of a mark," which includes "parody, satire, editorial and other forms of expression that are not part of a commercial transaction." Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 924 F. Supp. 1559, 1573-74 (S.D. Cal. 1996)

(declining to issue injunction, and rejecting argument that use was commercial because mark was used to help sales: "an expressive use is not rendered commercial by the impact of the use on sales. . . . The Court therefore holds that the First Amendment would apply to this use of the trademarks at issue, and that as an expressive use, this use is exempt from the reach of the Federal Trademark Dilution Act."), aff'd, 109 F.3d 1394 (9th Cir. 1997).[10] Indeed, the same First Amendment considerations that limit Mattel's Lanham Act claim must apply to its dilution claim. Yankee Publishing, 809 F. Supp. at 282. As the Court put it in L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26 (1st Cir. 1987), cert. denied, 483 U.S. 1013 (1987):

> "Trademark parodies, even when offensive, do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner. . . . Denying parodists the opportunity to poke fun at symbols and names which have become woven into the fabric of our

---

[10] Mattel's implication in a footnote that defendants' song constitutes "commercial" speech because its purpose is "to make money" (Motion at 25 n.6) is incorrect. See Ocean Bio-Chem, 741 F. Supp. at 1552-53 n.2 (rejecting plaintiff's argument that "defendants' speech is commercial speech merely because defendants seek to profit from their expressive activities. . . . ***Commercial speech is narrowly defined at that which proposes a commercial transaction.***") (emphasis added); New Kids, 971 F.2d at 309 ("Where, as here, the use does not imply sponsorship or endorsement, the fact that it is carried on for profit . . . is beside the point."); Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 970 (10th Cir. 1996) ("Cardtoons need not give away its trading cards in order to bring them within the ambit of the First Amendment. . . . Although the cards are sold in the marketplace, they are not transformed into commercial speech merely because they are sold for profit.").

daily life, would constitute a serious curtailment of a protected form of expression." 811 F.2d at 34.

Mattel has not come close to meeting its burden of proof or even establishing a prima facie case of dilution. The gravamen of a dilution claim is not (as Mattel tries to argue) merely the use by the defendant of the plaintiff's trademark in a purportedly negative context:

"Neither the strictures of the first amendment nor the history and theory of anti-dilution law permit a finding of tarnishment based solely on the presence of an unwholesome or negative context in which a trademark is used without authorization. Such a reading of the anti-dilution statute unhinges it from its origins in the marketplace. ***A trademark is tarnished when consumer capacity to associate it with the appropriate products or services has been diminished.***" L.L. Bean, 811 F.2d at 31 (emphasis added).

For this reason, the use of a trademark in an artistic or parodic context, as here, does not cause dilution "since the success of the use depends upon the continued association of the mark with the plaintiff . . . " Yankee Publishing, 809 F. Supp. at 282 (citation omitted). In addition, the likelihood of tarnishment is lessened where, as here, the parties are not in direct competition. Elvis Presley Enterprises, 950 F. Supp. at 799.

Mattel has not offered any evidence to support its dilution claim -- only its wildly exaggerated and unsupported contention that *Barbie Girl* is somehow "lewd" and "denigrating." This clearly is insufficient. See Elvis Presley Enterprises, 950 F. Supp. at 799 (rejecting dilution claim where "[p]laintiff bases its tarnishment claim on the unsupported assumption that Defendants' use of the Elvis name in association with a tacky bar that indiscriminately displays explicit and almost pornographic paintings of nude women has tainted the wholesome image of Elvis"). Moreover, this contention clearly is wrong. The mild double-entendre lyrics and the tongue-in-cheek video,

especially in today's world, are "G-rated by most standards" (as one review stated). They are far less provocative than many songs and pale in comparison to what routinely is available on free television, in movies, and even in comic books.

Indeed, many of the other recordings about Barbie already in circulation contain far more "adult" content than *Barbie Girl*. In his recently recorded song *Barbie*, the well-known folk singer David Wilcox sung about "the untold story" behind Barbie, including that she "studied theater at UCLA/Dated O.J. once I'm sorry to say/Then came Ken, to star in her play/She was shattered to learn that he was gay . . . " Id. Wilcox also sang that Barbie "made a career leading cheers for the L.A. Lakers/then became the main mistress of the Reverend Jim Bakker/Helped him hear his messages from the Lord/with a vibrator and a ouija board." Id. In 1993, respected blues-rocker John Hiatt sung about *The Wreck of the Barbie Ferrari*, in which a disturbed father takes out a shotgun and "splatters 'em all/The Ken and the Midge and the Skipper doll . . . He wonders if he ever said 'I do'/To that little blond plastic voodoo . . . " Id. In 1992, the female rock band Shonen Knife released *Twist Barbie*, in which they described Barbie as a "sexy girl" with "blue eyes, blond hair/tight body, long legs/she's glamorous, she's welcomed by boys . . . " Id. Similarly, in 1995, the Lunachicks released a song called *Bitterness Barbie*, in which they sang profanely, from Barbie's perspective:

Why must I stand on my toes?
Perfect smile and skin-tight clothes
Cinched waist, no [ ][11] to piss with
A stamp on my ass
Little girls worship me but that'll never come to pass . . .
What if I had a mastectomy?
Would they buy a one-titted Barbie?
With whiskers, clogged-up pores

---

[11] One explicit and demeaning word has been deleted.

you know they'd take me out of the stores . . .
Bitterness Barbie, she ain't smiling
Bitterness Barbie, she ain't styling
Bitterness Barbie, boobs are sagging
Bitterness Barbie, ass is dragging . . .

And Mattel is concerned about *Barbie Girl*?

***All*** of the dilution cases cited by Mattel where injunctions were granted dealt with blatantly offensive portrayals in ways and contexts distinctly unlike the present case. See Coca-Cola Co. v. Gemini Rising, Inc., 346 F. Supp. 1183 (E.D.N.Y. 1972) (posters used Coca-Cola's logo to advocate the use of cocaine); Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2d Cir. 1979) (defendant falsely advertised that actual Dallas Cowboy cheerleader appeared in XXX-rated pornographic film); Pillsbury Co. v. Milky Way Productions, Inc., 215 U.S.P.Q. 124 (N.D. Ga. 1981) (pornographic magazine "Screw" featured drawing of Pillsbury Doughboy engaged in "sexual intercourse and fellatio"); Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc., 642 F. Supp. 1031 (N.D. Ga. 1986) (defendant depicted dolls similar to plaintiff's dolls in "rude, violent and frequently noxious settings."); Toys 'R' Us v. Akkaoui, 1996 U.S. Dist. LEXIS 17090 (N.D. Cal. 1996) (in unpublished opinion, court enjoined sale of adult sexual devices and clothing under the name "Adults R Us"). Mattel cannot reasonably claim that *Barbie Girl* comes anywhere close to the level of depravity that has motivated courts to grant such injunctions.

The truth is that Mattel's dilution claim is fundamentally disingenuous and hypocritical. ***Mattel itself*** has produced or authorized many Barbie products that are substantially more "promiscuous, lewd, stereotyp[ical], and denigrat[ing] of young women" (Motion at 25) than *Barbie Girl*. Barbie began life as Lilli, a German doll sold to adults in men's smoke shops that Mattel copied to create the first Barbie doll. Mattel has continued to this day to exploit the sexual origin and nature of Barbie. Indeed, Barbie's measurements are one of her attributes most frequently commented upon.

Mattel markets a "Harley Barbie" doll, dressed in chains and a leather biker's outfit; a "Baywatch Barbie", complete with photographs of the scantily clad women of "Baywatch" on the package; Barbie dolls designed around Elvis Presley and Marilyn Monroe themes, notwithstanding the sexually-related public images of those celebrities and their drug-induced deaths; and Barbie with wine glasses and wine buckets. Mattel also has licensed books, including The Art of Barbie, and expressly approved pictures of Barbie in numerous nude, partially nude, and otherwise sexually explicit poses.

Obviously, Mattel cannot really be concerned that *Barbie Girl* will tarnish Barbie's image, given Mattel's efforts over the years, and given the countless Barbie jokes, parodies, and commentaries that have resulted. See Hormel, 73 F.3d at 501 (concluding that an "untidy" boar Muppet did not dilute the reputation of Hormel's "Spam" mark and noting that "by now Hormel should be inured to any such ridicule" of its SPAM product because "countless jokes have played off the public's unfounded suspicion that SPAM is a product of less than savory ingredients."). Mattel's real goal, under the artificial guise of "dilution", appears to be to control public discussion about Barbie by demanding that any such commentary be approved and licensed by Mattel. "The problem with this scheme, as the Supreme Court noted in the context of copyright parody, is that 'the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.'" Cardtoons, 95 F.3d at 972.

Thus, if the law of dilution were defined as broadly as Mattel advocates, *Barbie Girl* would not exist, but neither would innumerable other songs, including those identified in this brief. In that regard, there is no difference between a song, a poem, a magazine cover story, and a newspaper column; enjoining social comment about or criticism of a cultural icon, even if that icon also allegedly is a trademark, effectively would create an expansive right permitting any trademark holder to censor critical debate under the pretense of "dilution." This cannot be, and is not, the law. "If the anti-dilution statute were construed as permitting a trademark owner to enjoin the use

of his mark is a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct. . . . The Constitution does not, however, permit the range of the anti-dilution statute to encompass the unauthorized use of a trademark in a noncommercial setting such as an editorial or artistic context." L.L. Bean, 811 F.2d at 33.

## III. MATTEL'S STATE LAW CLAIMS ARE MATERIALLY IDENTICAL TO ITS FEDERAL CLAIMS AND FAIL FOR THE SAME REASONS.

Mattel contends that the standards governing its state law claims are identical to its federal claims. Motion at 22, 26. Without conceding this point, under Mattel's own interpretation of the law, it is not likely to succeed on the merits of its state law claims for the same reasons its federal claims are unlikely to succeed.

## IV. MATTEL HAS NOT SHOWN ANY OF THE PREREQUISITES NECESSARY TO JUSTIFY URGENT INJUNCTIVE RELIEF.

Mattel's own conduct, and the admissions of its expert on damages, conclusively demonstrate the absence of the urgency required to justify a preliminary injunction -- particularly one that would essentially grant Mattel all of the relief that it would obtain after a trial on the merits. Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963) ("it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial. This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it."), cert. denied, 375 U.S. 821 (1963); Schneider, Hill & Spangler, Inc. v. Cudmore, 325 F. Supp. 173, 176-77 (D. Conn. 1971) (where the effect of an injunction "is prematurely to give the party seeking it a substantial part of the relief sought in the final judgment . . . plaintiff's burden of showing irreparable injury is especially heavy.").

**A. Mattel Admits That Its Alleged Damages Are Calculable.**

Mattel's expert admitted that he could calculate the amount of alleged damages suffered by Mattel from the *Barbie Girl* song:

"Q: You have no doubt, do you, sir, that given the information, you'd be able to quantify damages? That's part of what you do, isn't it?

A: Yes, it is.

Q: And you'd be able to do that here; right?

A: In this case?

Q: Yes, sir.

A: Yes. In this case, yes." (Anson Depo. at 27.)

See also Anson Decl. ¶¶ 3, 45 ("there would be substantial and quantifiable damages . . ."). Standing alone, this admission compels denial of injunctive relief. August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 619 (7th Cir. 1995) ("the possibility of compensation offer sufficient protection to a trademark owner, when an injunction bids fair to stifle competition and injure consumers in order to ward off occasional confusion."). Of course, there is no doubt that defendants, which include MCA Records, Inc., one of the largest record companies in the U.S., can respond in damages in the unlikely event that any ultimately were assessed.

**B. Mattel's Delay Evidences The Lack Of Urgency Of The Relief It Seeks.**

It is well-established that "delay alone may justify denial of a preliminary injunction" because the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276-77 (2d Cir. 1985). In this case, the song *Barbie Girl* had already received worldwide exposure for five months by the time Mattel brought this lawsuit -- including in Europe where Mattel has a large presence. Mattel then delayed another month before filing the present motion, by which time *Barbie Girl* already had been released as a single, been on the charts, and been released on the Aquarium album which had reached the album

charts in the United States. Even if an injunction were issued now, the song would not magically disappear from the memories of those who had heard or bought it, nor could radio stations be prohibited from continuing to play it. For better or worse, the song has existed for over half a year and has been distributed worldwide. Indeed, ***Mattel initially reacted favorably to the song when it was released in Europe.*** Only after it was released here did Mattel change its mind and decide to file a lawsuit, and later to seek an injunction.

**C. The Balance Of Hardships Clearly Favors Defendants.**

The "critical element" in evaluating the propriety of injunctive relief is "the relative hardship of the parties." City of Anaheim v. Kleppe, 590 F.2d 285, 288 n.4 (9th Cir. 1978). Even if there were a likelihood of success on the merits, if the balance of hardships tilts in favor of defendants, preliminary relief will be denied. See, e.g., John Lemmon Films, Inc. v. Atlantic Releasing Corp., 617 F. Supp. 992, 997 (W.D. N.C. 1985) (where grant of preliminary injunction would cause defendant to lose contracts, and require defendant to change its film prints and to develop a new advertising campaign, Court held it would be inequitable to cause defendant to lose its investment and goodwill before final decision on the merits).

Here, even if Mattel were likely to succeed on the merits of its claims (which it is not), preliminary injunctive relief would devastate the Aquarium album; debilitate the career of the band, Aqua, that otherwise appears poised to establish itself as a major attraction; and provide little benefit to Mattel. In an interesting public relations maneuver, Mattel chose not to sue Aqua itself, which wrote the allegedly infringing song, and has made statements in the press that it supposedly bears no "ill will" toward the band. Yet, Mattel has to know that an injunction would most directly affect the band's fledgling career.

On the other hand, Mattel apparently continues to prosper greatly, and continues to sell Barbie dolls, without any discernible impairment due to defendants' activities. On or about October 22, 1997, Mattel issued a press release touting its sales

and profits from its "core Barbie brand," even claiming that it was "unable to produce enough toys to meet demand" (Wall Street Journal, Oct. 22, 1997, at B5) -- hardly the picture of irreparable harm. If the status quo is maintained, Aqua will go on to other songs and albums and Mattel will still be selling more Barbie dolls than it can make.

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that Mattel's motion for a preliminary injunction be denied.

Dated: November 3, 1997

RUSSELL J. FRACKMAN
GEORGE M. BORKOWSKI
JEFFREY D. GOLDMAN
MITCHELL SILBERBERG & KNUPP LLP

By: ______________________
Jeffrey D. Goldman
Attorneys for Certain Defendants

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California.

I am over the age of 18 and not a party to the within action; my business address is Mitchell, Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, California 90064.

On November 3, 1997, I served the foregoing document described as

**MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS MCA RECORDS, INC. AND UNIVERSAL MUSIC & VIDEO DISTRIBUTION, INC. IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION OF PLAINTIFF MATTEL, INC.**

on interested parties in this action by placing a true copy thereof which was enclosed in a sealed envelope addressed as follows:

Adrian M. Pruetz
Adam D. Samuels
Quinn Emanuel Urquhart & Oliver LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

I caused such document(s) to be hand delivered during normal business hours to the offices(s) of the addressee(s).

I am employed in the office of an attorney admitted to the bar of this Court at whose direction the service was made.

Executed on November 3, 1997 at Los Angeles, California.

Carolyn J. Carr