1   RUSSELL J. FRACKMAN
    GEORGE M. BORKOWSKI
2   JEFFREY D. GOLDMAN
    MITCHELL, SILBERBERG & KNUPP LLP
3   11377 West Olympic Boulevard
    Los Angeles, California 90064-1683
4   (310) 312-2000

5   Attorneys for Defendants MCA Records, Inc.,
    Universal Music International Ltd., Universal
6   Music A/S, MCA Music Scandinavia AB, and
    Universal Music & Video Distribution, Inc.

7



8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  MATTEL, INC., a Delaware corporation,    )   CASE NO. 97-6791 WMB (RNBx)
                                             )
12                   Plaintiff,              )   **DEFENDANTS' EVIDENTIARY**
                                             )   **OBJECTIONS TO AND MOTION TO**
13          v.                               )   **STRIKE DECLARATION OF WESTON**
                                             )   **ANSON FILED IN SUPPORT OF**
14  MCA RECORDS, INC, a California           )   **MATTEL, INC.'S MOTION FOR A**
    corporation, UNIVERSAL MUSIC             )   **PRELIMINARY INJUNCTION**
15  INTERNATIONAL LTD., a British            )
    company, UNIVERSAL MUSIC A/S, a          )   Date:  November 24, 1997
16  Danish business entity, MCA MUSIC        )   Time:  10:00 a.m.
    SCANDINAVIA AB, a Swedish business       )   Ctrm:  Hon. William Matthew Byrne, Jr.
17  entity, LOCOMOTION KOFOD                 )
    SCHILLER FILM A/S, a Danish business     )
18  entity, UNIVERSAL MUSIC & VIDEO          )
    DISTRIBUTION, INC., a New York           )
19  corporation; and DOES 1-20,             )
                                             )
20                   Defendants.             )
                                             )
21  ─────────────────────────────────────   )
                                             )
22  MCA RECORDS, INC., a California          )
    corporation,                            )
                                             )
23                   Counterclaimant,        )
                                             )
24          v.                               )
                                             )
25  MATTEL, INC., a Delaware corporation,    )
                                             )
26                   Counterdefendant.       )
                                             )
27

28

Mitchell, Silberberg &
Knupp LLP

ENTERED ON ICMS 11/5

BXR_P002.MCA

# INTRODUCTION

1

2

3    In support of its motion for a preliminary injunction, plaintiff Mattel, Inc.

4  ("Mattel") has submitted only a handful of ambiguous and inadmissible comments from

5  unidentified members of the public, in an attempt to show "confusion" about the source

6  of the hit single *Barbie Girl*.  Mattel also did not conduct a survey, which ordinarily is

7  considered the best evidence of confusion.

8

9    In an attempt to fill this glaring evidentiary void, Mattel has turned to

10  Weston Anson ("Anson"), a purported "expert" who has proffered a conclusory,

11  unsupported declaration asserting that confusion is occurring or will occur, but declines

12  (or is unable to) support this conclusion with any facts or analysis.  Anson has also

13  submitted a matrix of his own invention -- the "Valmatrix" -- which he claims "tells the

14  Court" whether confusion exists.  Anson's grid is not based on any objective criteria

15  and does not follow any standard or explainable principle of measurement.  Anson's

16  grid has never been subjected to peer review and is entirely subjective and arbitrary.

17  Moreover, Anson cannot provide any explanation or factual foundation for the "score"

18  he derived by filling out his Valmatrix chart; and his deposition revealed that his

19  conclusions are not based on any meaningful investigation or foundation.  As one

20  judge of this Court already has found, Anson's Valmatrix has basic admissibility

21  problems and is of little or no probative value.  Judge Gadbois, in a 1995 Order in the

22  case of No Fear, Inc. v. Imagine Films, Inc., CV 95-6414 RG, referring to Anson and his

23  report based on the very same Valmatrix, wrote:

24

25    ". . . [T]he 'VALMATRIX' report presented by the plaintiff is

26    unsupported by any factual or empirical bases for its

27    confusion calculations and may be so devoid of probative

28    value as to be excludable under F.R.E. 703 . . .  Indeed, the

1                         basis for the calculus in the VALMATRIX report is

2                         conclusory and vague at best."

3

4 Order filed March 27, 1995, at 4 and n.2 (attached hereto as Exhibit A). Not a single

5 published case, or even a single unreported case in the on-line LEXIS and WESTLAW

6 databases, approves of the VALMATRIX method, notwithstanding Anson's claim that it

7 is "well accepted" (Declaration of Weston Anson ("Anson Decl.") ¶ 1). Anson's

8 declaration is inadmissible and should be stricken.

9

10 **ARGUMENT**

11

12 I.      **ANSON'S DECLARATION IS INADMISSIBLE AND**

13         **SHOULD BE STRICKEN IN ITS ENTIRETY.**

14

15          In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the

16 Court held that expert opinion must be reliable as well as relevant, that is, grounded in

17 scientifically sound reasoning and methodology rather than "subjective belief or

18 unsupported speculation." 509 U.S. at 590.

19

20          Here, Anson's declaration makes sweeping conclusions about confusion,

21 supposedly based upon his review of various unidentified internal Mattel documents

22 and interviews with "Mattel marketing and licensing managers." Declaration of Weston

23 Anson ("Anson Decl.") ¶ 4. Anson says the "conclusions set forth in this declaration are

24 based on facts gleaned from these materials and interviews" (<u>id.</u>), although he does not

25 specify *any* of these supposed facts. <u>See</u> <u>United States v. Various Slot Machines on</u>

26 <u>Guam</u>, 658 F.2d 697 (9th Cir. 1981) (disregarding expert affidavits on grounds that they

27 were unsupported by specific facts and thus were merely "5 1/2 pages of legal

28 pettifoggery" and "2 1/2 pages of quibble").

1    Apparently based on these unspecified "facts" obtained solely from Mattel

2    employees, Anson then filled out a chart that he invented and calls the "VALMATRIX",

3    using a "proprietary scoring technique," the parameters of which he does not reveal and

4    which apparently do not exist.  Anson Decl. ¶ 36.  Anson proclaims that the "score" he

5    obtains using his secret technique "tells the court and ourselves whether or not

6    confusion occurs."  Anson Decl. ¶ 36.  In this case, Anson's score was a "59" which he

7    claims represents "substantial, ongoing" (*though not "irreparable"*) confusion.  Anson

8    Decl., Ex. F.

9

10    At his deposition, Anson admitted that in other cases, he has appended a

11    comments section to his Valmatrix chart which explains the rationale for the score.  In

12    this case, however, he did not do so because he was simply trying "to get to a

13    conclusion."  Deposition of Weston Anson ("Anson Depo.") 76:19-77:10, 84:18-85:14.[1]

14

15    Moreover, Anson admitted that no document exists setting forth any

16    objective criteria for scoring the Valmatrix; Anson maintains such a guideline inside his

17    head (the better to keep it "proprietary," perhaps).  Anson Depo. 72:4-12.  He does not

18    even follow in this case his own sparse criteria from his own article on the Valmatrix,

19    which he attaches as Exhibit E to his declaration.

20

21    He admitted that different people scoring the same trademarks can come

22    up with a different score.  Id. 74:23-75:16.  Indeed, he admitted that it is possible that

23    ten different people could score the Valmatrix chart and come up with ten different

24    scores.  Id. 77:15-22.  In this very case, one of Anson's employees independently filled

25    out a Valmatrix chart.  Id. 42:6-43:4.  Anson's original Valmatrix score was in the low

26

27

28    [1]    Copies of the cited pages of the Anson deposition are attached hereto collectively as Exhibit B and are authenticated in the Declaration of Jeffrey D. Goldman filed herewith.

1    60s, while his colleague's score was in the low 50s (almost a 20% difference).  After

2    considering his colleague's score, Anson simply revised his score downward to a 59.  Id.

3    68:2-70:7.

4

5        Anson's methodology is not grounded in science and his declaration must

6    be stricken on this ground alone.  Daubert, 509 U.S. at 589-90; Deimer v. Cincinnati

7    Sub-Zero Products, Inc., 58 F.3d 341, 344 (7th Cir. 1995) (expert's testimony properly

8    excluded where "the witness did not conduct any studies or analysis to substantiate his

9    opinion" but merely "proffered unverified statements that were unsupported by any

10   scientific method.").

11

12       Moreover, Anson's failure to explain his methodology is fatal.  In Claar v.

13   Burlington N. R.R. Co., 29 F.3d 499 (9th Cir. 1994), the Ninth Circuit rejected expert

14   opinion contained in declarations where the supposed "experts" did not explain their

15   methodology.  29 F.3d at 502; see also United States v. Jones, 24 F.3d 1177, 1179-80 (9th

16   Cir. 1994) (excluding expert opinion on similar grounds); Navarro v. Fuji Heavy

17   Industries, Ltd., 925 F. Supp. 1323, 1328 (N.D. Ill. 1996) ("Experts cannot float their

18   conclusions on cushions of air; they must rest their conclusions upon foundations built

19   from reliable scientific explanation.").

20

21       In addition to his failure to explain the methodology underlying his

22   Valmatrix chart, Anson also refuses to explain how he arrived at the particular scores in

23   this case, other than that they are based on unspecified "facts" obtained from Mattel

24   employees and Mattel documents.  However, where an "expert" presents a computation

25   but does not show how the numbers were derived, such evidence is inadmissible.

26   United States v. Van Damme, 48 F.3d 461, 463-64 (9th Cir. 1995).

27

28

1    In fact, Anson did precious little research or investigation before filling out

2    his Valmatrix chart.  Anson admits he has no expertise regarding the record industry,

3    and did no independent research on it other than reviewing a stack of press releases

4    and similar materials.  Anson Decl. 117:24-119:8.  Anson did not talk to anyone in the

5    music business, or even anyone who runs a record store, in connection with this case.

6    Anson Decl. 53:7-18.  Moreover, he does not do surveys and never considered or

7    discussed doing one in connection with this case.  Id. 55:9-20.  He did not review a

8    single Mattel product, relying instead on photocopies.  Id. 109:1-12.  Moreover, even

9    though he opined that the "target audience" for both Mattel's Barbie products and

10   MCA's Barbie Girl song are the same (the "tween" audience), he did not do any analysis

11   to determine what percentage of Mattel Barbie products or the MCA *Barbie Girl* record

12   products are sold to this audience.  Id. 120:10-24, 121:9-12.  Anson did not even follow

13   up with the few allegedly confused people who sent E-mails to Mattel to see if they

14   were truly confused or to dispel any confusion, even though he admitted that would

15   "help theoretically" with his analysis.  Id. 170:12-171:12.

16

17   Anson's lack of research and investigation is reflected in his arbitrary,

18   haphazard, and result-oriented scoring of his Valmatrix chart.  For example:

19

20   ◆    On Anson's 1-5 scale, he scored the category of "Same or similar

21   trademarks" a 5.  However, when he did so, he was under the erroneous impression

22   that *Barbie Girl* was the title of Aqua's album (which is called Aquarium), rather than

23   just a song on the album.  He saw the word "Aquarium" on the cover but disregarded

24   it.  Anson Depo. 93:12-94:25.

25

26   ◆    Anson scored the category of "Same or similar packaging" a 3, but

27   at his deposition he admitted he was comparing the record with Mattel's rare ***music***

28   products, not with Mattel's packaging of Barbie dolls.  Anson admitted that had he

been comparing a Mattel Barbie doll package with an MCA music product, the score would be a 1 or possibly a 0.  Anson Depo. 102:10-21.

   ♦  Anson scored category 4, "same or similar channels," a 5.  Cross-examination of Anson on this topic resulted in this illuminating exchange:

   Q: Now, you gave that a number 5.

   A: Yes.

   Q: That's supposed to denote complete identicality, isn't it?

   A: Complete -- yes.

   Q: You don't mean to say that every place that an MCA BARBIE GIRL record is sold a Mattel doll is sold or a BARBIE GIRL product -- a Barbie product is sold, do you?

   A: No.

   Q: And you don't mean to say that every place that a Barbie -- Mattel Barbie product is sold, the MCA BARBIE GIRL recording is sold, do you?

   A: No.

   Q: Then there isn't complete identicality, is there?

   A: No.

   Q: Then it doesn't deserve a 5, does it?

   A: Yes, it does.

Anson Depo. 121:13-123:20.  Moreover, Anson admitted that he is not aware of a single store that has any Mattel Barbie products in the same portion of the store as the MCA *Barbie Girl* recording, nor has he made any effort to determine this.  Id. 128:2-9, 131:9-21.

   ♦  Anson also scored the category "same or similar advertising media" a 5.  However, he admits he has not done any analysis of what, if any, radio

1 advertising MCA has done in connection with *Barbie Girl*, has not heard any such

2 advertisements on the radio or seen any on television, nor has he compared any Mattel

3 television, radio, or print advertisements with any MCA advertisements. Anson Depo.

4 151:8-152:22.

5

6 Anson's desire "to get to a conclusion" (Anson Depo. 77:9-10) without the

7 tiresome consideration of actual facts does not excuse his lack of analysis or make his

8 Valmatrix any more admissible. Anson's declaration meets none of the prerequisites to

9 the admission of expert testimony and should be stricken in its Entirety.

10

11 II. **ALTERNATIVELY, DEFENDANTS MAKE THE FOLLOWING INDIVIDUAL**

12 **OBJECTIONS TO ANSON'S DECLARATION.**

13

14 **Paragraph 4.** Lacks foundation. Anson does not identify the Mattel

15 employees he supposedly interviewed, the extent of the interviews, the documents he

16 supposedly reviewed, or the particular facts on which his conclusions are based.

17

18 **Paragraph 5.** Lacks foundation.

19

20 **Paragraph 6.** Lacks foundation, legal conclusions.

21

22 **Paragraph 7.** Lacks foundation, legal conclusions.

23

24 **Paragraph 8.** Lacks foundation, best evidence.

25

26 **Paragraph 9.** Lacks foundation, best evidence.

27

28 **Paragraph 10.** Lacks foundation, irrelevant.

1    **Paragraph 11.** Lacks foundation, legal conclusions.

2

3    **Paragraph 12.** Lacks foundation, legal conclusions (e.g. "To a great extent

4    the sales success [of *Barbie Girl*] is based on the appropriation of Mattel's famous

5    BARBIE trade name, trademark, and trade dress").

6

7    **Paragraph 13.** Lacks foundation (e.g. "proliferation of websites" without

8    identifying any), legal conclusions, best evidence (e.g. "most disturbing of all os the

9    clear evidence of confusion in the E-mail").

10

11    **Paragraphs 14-34.** Anson's calculation of the purported value of the

12    Barbie product line is irrelevant to the present motion.

13

14    **Paragraph 35.** Lacks foundation (e.g. "well accepted method," "more

15    reputable alternative").

16

17    **Paragraph 36.** Lacks foundation (e.g. unspecified "proprietary scoring

18    technique," the Valmatrix score "tell the court" whether confusion occurs).

19

20    **Paragraph 37.** Lacks foundation.

21

22    **Paragraph 38.** Lacks foundation.

23

24    **Paragraph 39.** Lacks foundation, based on speculation (e.g. "The

25    consumer makes the connection with the BARBIE GIRL products to Mattel's BARBIE

26    trademark instantly and intuitively").

27

28

1          **Paragraph 40.** Lacks foundation (e.g. "lack of sophistication of the

2 consumers of this product"), based on speculation and argumentative (e.g. "poisoning

3 the well of goodwill").

5          **Paragraph 41.** Lacks foundation, best evidence (anson purports to

6 characterize the video as "sexually provocative" and "degrading" and "completely

7 counter to the reputation and imagery of the BARBIE doll").

9          **Paragraph 42.** Lacks foundation, legal conclusions.

11          **Paragraph 43.** Lacks foundation, based on speculation.

13          **Paragraph 44.** Lacks foundation, based on speculation.

15          **Paragraph 45.** Lacks foundation, based on speculation.

17          **<u>CONCLUSION</u>**

19          Defendants respectfully request that Anson's declaration be stricken, or

20 alternatively that their evidentiary objections to the declaration be sustained.

22 Dated:  November 3, 1997           RUSSELL J. FRACKMAN
                                   GEORGE M. BORKOWSKI

23                                      JEFFREY D. GOLDMAN
                                     MITCHELL SILBERBERG & KNUPP LLP

25                              By: _____

26                                       Jeffrey D. Goldman
                                 Attorneys for Defendants MCA Records, Inc.
                                 and Universal Music & Video Distribution,Inc.

FILED

MAR 27 1995

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NO FEAR, INC., | ) | CV 94-6414 RG (Ex) |
| Plaintiff, | ) | |
| | ) | O R D E R |
| vs. | ) | |
| | ) | |
| IMAGINE FILMS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

1.  In light of the novelty of the legal issues presented by this Case and the dearth of relevant case law in the Ninth Circuit, the parties shall respond to the following inquiries:

1.  Is it not clear from the progeny of <u>Rogers v. Grimaldi</u>, 875 F.2d 994 (2nd Cir. 1989), particularly <u>Twin Peaks Productions v. Publications Intern.</u>, 996 F.2d 1366 (2nd Cir. 1993) and <u>DeClemente v. Columbia Pictures Industries, Inc.</u>, 860 F. Supp. 30 (E.D.N.Y. 1994), that the Second Circuit now routinely engages in the eight-factor <u>Polaroid</u> analysis when applying the <u>Rogers</u> test? Is there any post-<u>Twin Peaks</u> case in the Second Circuit or elsewhere that has applied the two-step <u>Rogers</u> test without also engaging in the eight-factor likelihood of

1

010

confusion test?[1]

2. How is <u>Twin Peaks</u> distinguishable from this case?

    a. Is the fact that the book "Welcome to Twin Peaks" was admittedly about the "Twin Peaks" television show a principled basis upon which to distinguish <u>Twin Peaks</u> from this case?

    b. Is a product that is admittedly about the plaintiff's product necessarily more likely to confuse consumers than a product that is not about the plaintiff's product? Is it appropriate to base a legal distinction on such an assumption? Has any case following <u>Rogers</u>, in the Second Circuit or elsewhere, done so?

3. Even if <u>Twin Peaks</u> is distinguishable on this basis, have not other Second Circuit courts applied the eight-factor test in cases where the challenged works were arguably not specifically about the plaintiff's product? <u>See, e.g., Girl Scouts v. Bantam Doubleday Dell. Pub.</u>, 808 F. Supp. 1112, 1122 (S.D.N.Y. 1991), and <u>DeClemente</u>. How are these cases distinguishable from this one?

---

[1]In answering this question, disregard the somewhat murky reasoning of <u>DeClemente</u>, which appears to engage in the <u>Polaroid</u> analysis, only to find that summary judgment was appropriate under the literal language of <u>Rogers</u>.

2

EXHIBIT A

4.   According to Defendants' construction of Rogers and its progeny, a parody would be subject to a more rigorous test than the title of a work not intended to parody or criticize the plaintiff's product.  Why should a Lanham Act challenge to a movie title be subjected to a more rigorous test under Rogers than a similar challenge to a parody would be under Cliff Notes?

5.   Is there any other case law, other than that mentioned above or Kern v. WKQX Radio, 175 Ill.App.3d 624 (1988), involving a Lanham Act, dilution, or state law unfair competition claim against the title of a film or literary work which is not about the plaintiff or the plaintiff's product?  If so, do these courts employ the traditional eight-factor test or do they rely on a Rogers-type test?

6.   Have courts generally applied the First Amendment defense to trademark dilution claims?  If so, what standard is used for First Amendment defenses in dilution claims?

7.   Is there any other helpful, relevant case law, in the Second Circuit or elsewhere, addressing the First Amendment defense to the claims asserted in this case?

3

1       2.   Both parties shall file briefs addressing these
2   specific interrogatories no later than Monday, April 24, 1995.  The
3   parties may file opposition papers outlining their responses to the
4   arguments and authority set forth in the briefs no later than
5   Monday, May 1, 1995.  After completion of briefing, the matter of
6   the relevant legal standard will stand submitted.

7       3.   Should this Court be inclined to apply the eight-
8   factor test in assessing the viability of the defendant's First
9   Amendment defense, this Court would order to parties to rebrief the
10  likelihood of confusion test as applied to the specific facts of
11  this case.  Although the papers submitted thus far do address the
12  likelihood of confusion factors, they do so only briefly.  Neither
13  party has submitted consumer surveys or other persuasive data
14  tending to show the existence or the absence of likelihood of
15  consumer confusion.   This Court does note, however, that the
16  "VALMATRIX" report presented by the plaintiff is unsupported by any
17  factual or empirical bases for its confusion calculations and may
18  be so devoid of probative value as to be excludible under F.R.E.
19  703.[2]

20      4.   The likelihood of confusion factors in the Ninth
21  Circuit involve a highly fact-intensive analysis and that courts
22  therefore are reluctant to grant summary judgment on this issue.
23  See, e.g., Levi Strauss & Co. v. Blue Bell, Inc., 775 F.2d 1352,
24  1355 (9th Cir. 1985); United States Jaycees v. San Francisco Junior
25

26      [2]Indeed, the basis for the calculus in the VALMATRIX report is
    conclusory and vague at best.  See Declaration of Weston Anson, ¶¶
27  5, 7.

28                        4

1   <u>Chamber of Commerce</u>, 354 F. Supp. 61, 68-69 (N.D.Cal. 1972), <u>aff'd</u>,

2   513 F.2d 1226 (9th Cir. 1975) (per curiam).

3          5.   Both logic and the evidence thus far presented tend

4   to indicate that there is little, if any, likelihood of confusion

5   in this case.   However, this Court will not make such a highly

6   factual determination unless the plaintiff utterly fails to present

7   any admissible evidence tending to show the existence of a genuine

8   issue of material fact as to the likelihood of confusion.   Both

9   parties shall be afforded the opportunity to present all relevant

10  evidence and to brief the issues thoroughly.

11         6.   Should the summary judgment motion be rebriefed on

12  the likelihood of confusion issue, the plaintiff is reminded that

13  it, and not the defendant, bears the burden on summary judgment to

14  present evidence tending to show the existence of a genuine issue

15  of material  fact  as  to  the  likelihood  of  confusion.    Upon

16  rebriefing  of  the  summary  judgment  motion,  this  Court  will

17  entertain responses to the objections filed by the defendant to the

18  plaintiff's declarations.

19

20

21       IT IS SO ORDERED.

22

23                                   _____
                                        RICHARD A. GADBOIS, JR.
24  DATED:        March 27, 1995        United States District Judge

25  ////

26  ////

27  ////

28                         5

014

EXHIBIT A

RECEIVED

OCT 27 1997

Mitchell, Silberberg & Knupp

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5    MATTEL, INC., a Delaware          )
     corporation,                      )
6                                      )
                        Plaintiff,     )   Case No.
7                                      )
          vs.                          )   97-6791 WMB (RNBx)
8                                      )
     MCA RECORDS, INC., a California )     VOLUME I
9    corporation, et al.,              )
                                       )
10                      Defendant.     )
     _____)

11

12

13

14              **CERTIFIED COPY**

15

16         DEPOSITION OF WESTON ANSON

17        Wednesday, October 22, 1997

18

19

20

21                                        The
                                          Egnatuk
22                                        Agency
                                    CERTIFIED SHORTHAND REPORTERS
23   REPORTED BY:
     Ingrid Suarez Egnatuk            370 South Crenshaw Blvd.
                                      Suite E-102
24   CSR No. 3098, RPR                Torrance, California 90503
                                      (310) 787-3240
25   File No.:   10-21-971

                                    EXHIBIT B

                                              1

1    probably talked to the client once or twice in

2    matters of scheduling and et cetera.

3            MR. FRACKMAN:  Off the record for a second.

4            (A discussion was held off the record.)

5    BY MR. FRACKMAN:

6            Q    Mr. Burden, can you be a little more

7    specific on what he did?

8            A        Terance Burden is director of our

9    valuation group.  He has met with the client.  He's

10   also sat in on at least one client -- one interview

11   with management personnel at Mattel.  And he and I

12   worked together closely on the brand valuation.  For

13   example, he constructed the section on the weighted

14   average cost of capital under my direction.

15           Q    Are you finished?

16           A    Yes.

17           Q    Did he prepare any memos or notes for

18   you on the work he had done?

19           A    He may have.  And if he has, I would

20   assume they're still in the file.

21           Q    Did he -- did Mr. Burden have any

22   direct input on the -- on the Valmatrix Likelihood of

23   Confusion Analysis, which is Exhibit F to your

24   Declaration?  I don't mean the general concept, but I

25   mean the specific analysis here.

                                                    42

EXHIBIT B

1          A       Yes.  He independently of myself would

2     have scored the confusion matrix, and I would have

3     taken his input before doing the final scoring of

4     Exhibit F.

5          Q       Did anyone other than Mr. Burden go

6     through that exercise, which is to say, independently

7     scored the analysis, before you did your final?

8          A       I don't think so.

9          Q       Do you recall when you were first

10    contacted to potentially be an expert witness in this

11    case, sir?

12         A       Sometime before Labor Day.  So I would

13    think late August.

14         Q       And who contacted you, sir?

15         A       I believe it was Ms. Pruetz.

16         Q       Do you recall in that conversation

17    whether you discussed what your assignment would be?

18         A       I think we did.

19         Q       Tell me as best you recall what she

20    said and what you said, sir, on that subject.

21         A       Had I heard the BARBIE GIRL song yet.

22    Did I have any opinion on the song.  I had not at

23    that point heard it; that it was a matter of some

24    urgency.  Time was relatively short; that MCA clearly

25    was leveraging off the Barbie trademark, at least

                                                    43

1  We pretty well laid out the task as described in the
2  Declaration.

3          Q       What do you understand it to be, in
4  general terms?  What's the point?

5          A       The point of our work --

6          Q       Uh-huh.

7          A       -- is to identify potential damage and
8  to look at the issues of confusion and dilution.

9          Q       Did you ever discuss with anyone in
10 connection with your work in this matter the
11 possibility of doing a consumer survey, sir?

12         A       No.

13         Q       It was never raised one way or the
14 other?

15         A       We no longer do surveys.  So it would
16 not be logical for it to be raised.

17         Q       So it wasn't?

18         A       Correct.

19         Q       Ms. Pruetz didn't raise it?

20         A       I don't think so.

21         Q       When you say you no longer do surveys,
22 did you at one time?

23         A       Yes.

24         Q       And when was that?

25         A       Up until about, oh -- I don't know --

                                                    55

1   background here on the record.

2          Q       Are you the only one at TLA who is

3   responsible for or permitted to disseminate a final

4   Valmatrix Likelihood of Confusion Analysis to a

5   client?

6          A       No.

7          Q       Mr. Burden does?

8          A       Yes.

9          Q       But he didn't here?

10         A       No.

11         Q       And Exhibit F was ultimately prepared

12  by you?

13         A       Yes.

14         Q       And you had Mr. Burden's input first?

15         A       I did.

16         Q       Did he actually score his own Valmatrix

17  Likelihood of Confusion Analysis for you?

18         A       I think so.

19         Q       Do you still have it?

20         MS. PRUETZ:  I think this was asked and

21  answered a few minutes ago.  I think he said he would

22  look.

23  BY MR. FRACKMAN:

24         Q       Okay.  I'll accept that.

25         A       No.

                                                        68

```
 1          Q        "No," you don't or "no," you don't
 2   know?
 3          A        I do not.
 4          Q        I'm sorry.  I missed that one.
 5          MS. PRUETZ:  I think the witness is really
 6   hungry.  We need to take a break now.
 7          THE WITNESS:  And I'm sorry.  I apologize.  If
 8   we just order a sandwich, that's all I need.
 9   BY MR. FRACKMAN:
10          Q        Can we just get an answer to whether
11   you have it or not.
12          A        I would think not.  I will check.
13          MR. FRACKMAN:  Okay.
14          (Recess from 1:03 p.m. to 1:05 p.m.)
15   BY MR. FRACKMAN:
16          Q        You looked at, though, Mr. Burden's
17   analysis before you finalized yours --
18          A        Yes.
19          Q        -- is that correct?
20          A        Yes.
21          Q        Did he have any scores that were
22   different than yours on any of the categories?
23          A        I'm sure he did.
24          Q        How many?
25          A        I don't recall.
```

69

1          Q       How different?

2          A       Well, as I recall, my score was a

3     little higher than what you see here.  My original

4     score was in the low 60s.  And as I recall, his score

5     was in the low 50s, perhaps 53, 54.  We discussed, we

6     rethought, I reworked, and my revised and final

7     report contains a score of 59.

8          Q       Do you remember any particular one of

9     the 15 what you've headed "Factors" where you and

10    Mr. Burden varied the most?

11         A       I do remember No. 13 in particular.

12         Q       Which is called "Same or similar

13    promotional products and tie-ins."

14                 And what was -- how did you vary?

15         A       He had a lower score, a 0 or a 1.

16         Q       And you had?

17         A       3 or a 4.

18         Q       Any others where there was a difference

19    that you recall?

20         A       I think on No. 11.

21         Q       Which is called "Same or similar

22    pricing."

23         A       Right.  As you can see, I scored a 5,

24    which says the pricing is quite similar.  I believe

25    his score was lower based on the fact that there were

70

EXHIBIT B · ◄          021

1          A        I don't think I did, no.

2          Q        Did Mr. Burden?

3          A        I doubt it.  I don't know.

4          Q        Is there anything at all that lays down

5     any objective criteria for scoring the Valmatrix

6     Likelihood of Confusion Analysis?

7          A        When you say "lays down," again, I

8     assume you mean something like a booklet that says

9     "Guidelines to Scoring."  In that sense there is not.

10         Q        Do you have in your head a guideline

11    for scoring?

12         A        Yes.

13         Q        And can you describe it for me.

14         A        Yes.  And it runs approximately as

15    follows, and that is that where you have a factor

16    that is close to or at being identical, the score is

17    compelled to be 5.  Where you have a factor and you

18    cannot identify any points of similarity between the

19    two parties, the score must be 0.  An average score

20    or an average degree of similarity is a 2.  As you go

21    from 2 to 5, the similarities increase geometrically.

22         Q        Now, what is average similarity, sir?

23         A        Well, let's use, for example, same or

24    similar packaging, just as an example.  If, for

25    example, in same or similar packaging, if one package

                                                      72

EXHIBIT B

1    double what a 3 is, and a 5 is double what a 4 is.

2         Q        So a 4 has twice as much similarity as

3    a 3?

4         A        Yes.

5         MR. FRACKMAN:  Let's go off the record.

6         (A discussion was held off the record.)

7    BY MR. FRACKMAN:

8         Q        You gave us an example, Mr. Anson, of

9    what might be a 0 or a 2.

10             How does somebody other than you know

11   whether something is going to be a 0 or a 2 or a 3 or

12   a 4 or a 5?

13        A        Well, based on experience with

14   trademarks and in licensing, it takes, I think,

15   someone who is accustomed to working with trademarks

16   and brands just to be able to discern the

17   similarities and differences.  Could someone -- could

18   a brand manager from Procter & Gamble sit down and

19   score this and come out with a fairly reliable score?

20   Yes, they could.  On the other hand, could an

21   aerospace engineer from Hughes sit down and score

22   this fairly reliably?  I don't think so.

23        Q        But different people scoring the same

24   trademarks can have a different score; right?

25        A        I would think so.  Just like in a

74

EXHIBIT B    023

1    consumer survey.  People responding to the same

2    question may have somewhat different answers.

3              Q      Mr. Burden, is he experienced in doing

4    this?

5              A      I think he is.

6              Q      And his initial score was different

7    than yours?

8              A      Yes.

9              Q      Actually, pretty significantly

10   different.  Wouldn't you agree?

11             A      By about 15 percent.

12             Q      It sounded like 15 or 20 percent to me

13   when you described it.

14                    But that's a significant difference,

15   isn't it?

16             A      It's 15 percent.

17             Q      Now, when you scored Exhibit F, did you

18   make any notes that would refer to your thought

19   process in scoring it?

20             A      Probably did in my first handwritten

21   version.

22             Q      How many versions did you go through?

23             A      One and then a -- this final that you

24   see here.

25             Q      Your first one was your handwritten

                                                        75

```
 1    version?

 2          A     Yes.

 3          Q     And that's the one you discussed with

 4    Mr. -- is that the one you discussed with Mr. Burden?

 5    I'm a little confused.

 6          A     Yes.

 7          Q     And then the final one?

 8          A     Yes.

 9          Q     And then in the first one you may have

10    made some notes?

11          A     Yes.

12          Q     Do you still have those notes?

13          A     Probably not.  Because it would be part

14    of the first draft.

15          Q     And you don't have the first draft

16    anymore?

17          A     Typically we don't save earlier drafts

18    of -- of any report.

19          Q     Now, in your -- in Exhibit E, which is

20    your article, at the very end you have a -- although

21    it's not called it -- it's on page 49 of the

22    Declaration -- it is a Valmatrix analysis; correct?

23          A     Yes.

24          Q     In that version you have a column

25    that's headed "Comment."
```

EXHIBIT B .M  025

```
1                    Do you see that?

2         A    Yes.

3         Q    Which I assume is intended or was

4    intended, at least in part, to explain the rationale

5    for the number?

6         A    Yes.

7         Q    Is there some reason you don't have a

8    Comments section on Exhibit F in this case?

9         A    Well, we're not writing for a specific

10   audience here.  We're writing to get to a conclusion.

11        Q    Well, there's nothing analogous to your

12   Comments section in Exhibit F, is there, that would

13   tell what the rationale is for the number?

14        A    That's correct.

15        Q    Is there any doubt in your mind, sir,

16   that 10 different people could score this Valmatrix

17   Likelihood of Confusion Analysis and come up with 10

18   different scores?

19        A    Are you asking me is that possible?

20        Q    Is it likely?

21        A    I don't think it's likely, but it's

22   possible.

23        Q    Is it likely that they would all come

24   up with the same score?

25        A    It's likely that they would come up --
```

77

1  Confusion Valmatrix Likelihood of Confusion

2  Analysis," unquote.

3          Q       And how many times have you done one of

4  those?

5          A       Between 25 and 75 times in environments

6  outside of litigation.

7          Q       And are the 15 categories always the

8  same?

9          A       Yes.  I think you asked me that a

10 moment ago.

11         Q       Yes.  But now that I have the lingo

12 down, I thought I'd make sure I knew what we were

13 talking about.

14         MS. PRUETZ:  Off the record.

15              Is that okay?

16         MR. FRACKMAN:  Yes.

17         (Recess from 1:38 p.m. to 1:56 p.m.)

18 BY MR. FRACKMAN:

19         Q       Mr. Anson, then, would I be correct,

20 sir, that there is nothing in writing -- either

21 notes, a report, or anything else -- that would

22 detail or describe your thinking of the way in which

23 you scored the consumer confusion Valmatrix

24 Likelihood of Confusion Analysis that is Exhibit F?

25 Would that be correct?

84

1           A       Yes.

2           Q       Do you ever, when you prepare one of

3    these Valmatrix analyses, do you ever prepare any --

4    such a report for your clients at the same time that

5    goes through your analysis?

6           A       Sometimes.

7           Q       You didn't do it here?

8           A       No.

9           Q       Why not?

10          A       Well, the Declaration, I think, speaks

11   for itself.

12          Q       Well, the Declaration doesn't go

13   through each of these factors, does it, sir?

14          A       No, I don't believe it does.

15          Q       On the bottom there is a scoring

16   system.  It starts 0 to 15 minimal confusion.

17                  Do you see that at the bottom of

18   Exhibit F?

19          A       Yes.

20          Q       Can you tell me where those different

21   categories come from, categories of confusion or lack

22   of confusion?

23          A       Yes.  It's based on our experiences as

24   a firm and my own personal experiences in this

25   business over the last 23 years.

                                                      85

EXHIBIT B                028

1    of having been called "AQUARIUM," was called "BARBIE

2    GIRL," the title of the album.  Would that be more

3    confusing than it is now or the same?

4              MS. PRUETZ:  That assumes facts not in

5    evidence.

6              MR. FRACKMAN:  Well, that's right.  It sure

7    does.

8              MS. PRUETZ:  Because "BARBIE GIRL" is right on

9    the front of your AQUARIUM album.  So I think you're

10   asking a question that's not really answerable in

11   that form.

12   BY MR. FRACKMAN:

13             Q    When you bought the album, you knew

14   what the title of the album was, didn't you, sir?

15             A    I, frankly, did not.  I thought the

16   title of the album was "BARBIE GIRL."

17             Q    You did?

18             MS. PRUETZ:  Well --

19             THE WITNESS:  Can I finish my answer?

20   BY MR. FRACKMAN:

21             Q    I apologize.  I'm just incredulous.

22   But go ahead.

23             A    When I bought the CD, it says -- the

24   sticker says, "Contains hit single BARBIE GIRL."  I

25   didn't know until I was several days into this

                                              93

1   project that the album had a different name.  And I'm

2   a fairly sophisticated person.

3          Q      Well, let me show you Exhibit I to

4   Ms. McKenzie's -- to Mr. Samuels' Declaration.

5                 Is that the -- what the cover of the CD

6   that you bought looked like?

7          A      It looks very similar.

8          Q      And you thought the title of the album

9   was what when you bought it?

10         A      BARBIE GIRL.  When I look at this --

11  and I still do.  I think the name of the group is

12  Aqua, and the name of the CD is BARBIE GIRL.  Now,

13  subsequent to seeing this, I understand that that's

14  not the case.

15         Q      What did you think "AQUARIUM" was when

16  you looked at this?

17         A      No idea.

18         Q      Do you have an idea now?

19         A      Of what?

20         MS. PRUETZ:  It's argumentative.

21  BY MR. FRACKMAN:

22         Q      Of what "AQUARIUM" refers to.

23         A      Again, I don't mean to be flip.  But

24  "AQUARIUM" can refer to that picture, which appears

25  to be a bunch of fish swimming in a bowl.

                                                   94

1  anything other than the packaging of those few music

2  items that you just referred to?

3        A     I stand by my earlier answer.

4        Q     Well, just give me a "yes" or "no."

5        A     Yes.

6        Q     What?

7        A     I'm not certain how I can clarify what

8  I said to you earlier.  So if I could just have my

9  earlier answer read in --

10        Q     All right.

11        Well, do you think that the packaging

12  of the Barbie doll as Mattel packages it is -- I'll

13  ask it this way:  If you were scoring Item No. 2

14  using a Mattel Barbie doll package and an MCA music

15  product -- leave aside Mattel music products that

16  you've mentioned -- what would the score on Item

17  No. 2 be?

18        A     The score would be lower.  It would be

19  probably a 1.

20        Q     Or a 0?

21        A     Possibly.

22        Q     Now, let me ask you about -- isn't it

23  true, sir, that -- well, let me put it differently.

24        Let's take a look at Exhibit D to

25  Ms. McKenzie's Declaration, the music cassette.

102

1          Q      By the way, did you ask Mattel for any

2     of these products that you mentioned that are in the

3     exhibit, for copies of those in their actual

4     packaging?

5          A      I asked if they were available.  They

6     are.  And I felt these color copies were sufficient.

7          Q      The color copies are one-dimensional,

8     of course.

9          A      Yes.

10         Q      And packaging is many-dimensional,

11    multidimensional; is that correct?

12         A      I'll accept that.

13         Q      So you don't know what -- I'll withdraw

14    the rest of that.

15         A      Thank you.

16         Q      You're welcome.

17                Do you know how many copies of

18    Exhibit E have been sold by Mattel?

19         A      No.

20         Q      Did you ask?

21         A      I did not.

22         Q      Would it be important for you in

23    formulating your opinion?

24         A      I don't think so.

25         Q      And Exhibit F you pointed to was called

                                                          109

                              EXHIBIT B PR.           032

```
1              Q       Now, in this particular instance when
2       you're talking about "target audience," are you
3       talking about the target audience for what you've
4       called Mattel music, or is the target audience for
5       the other Mattel Barbie products?
6              MS. PRUETZ:  That question is compound.  There
7       are an awful lot of Barbie products.  And I guess
8       that's why you're asking.
9       BY MR. FRACKMAN:
10             Q       What products are you talking about
11      here?
12             A       The target audience for Barbie-branded
13      products as a group, as a whole.
14             Q       So --
15             A       As well as the target audience for the
16      Barbie music and entertainment products put out by
17      Mattel.
18             Q       So in Item No. 2 --
19                     (A conference was held between
20                     the witness and Ms. Pruetz.)
21      BY MR. FRACKMAN:
22             Q       -- same or similar packaging -- I'll
23      withdraw that.
24                     Where did you get the information that
25      you had -- what was the information you had about the
```

117

1    MCA target audience?

2         A       Well, we've got a stack of press

3    releases.  We've got a stack of marketing materials.

4    All of which is clearly targeted to the tween

5    audience, particularly the female tween audience.

6         Q       When you say you have a "stack," is it

7    anything other than -- are you referring to anything

8    other than what's attached to any of these

9    Declarations that were filed by Mattel?

10        A       I think there is probably enough

11    attached to these Declarations.

12        Q       So you weren't relying on anything

13    other than what was attached to the Declarations

14    in --

15        MS. PRUETZ:  Mischaracterizes.

16        MR. FRACKMAN:  Well, that's my question, then.

17        THE WITNESS:  We reviewed a number of

18    documents, all of which have been furnished to you,

19    many of which discuss the MCA BARBIE GIRL album and

20    single and many of which discuss the marketing to the

21    female tween audience.

22    BY MR. FRACKMAN:

23        Q       So that's what you were relying on,

24    documents that you've looked at that talk about the

25    MCA record?

                                                      118

EXHIBIT B        034

```
1              A      Yes.

2              Q      Did you do any other kind of

3      independent research to determine what the target

4      audience was for that kind of music today?

5              A      No.

6              Q      You don't consider yourself an expert

7      in the record business, do you, sir?

8              A      In the record business, no.

9              Q      Do you know or did you do any analysis

10     of -- you mentioned the two Mattel target audiences,

11     the very young girl and the tween.

12                    Do I have that right?

13             MS. PRUETZ:  I think that mischaracterizes it

14     the way you just said it.  He mentioned two target

15     audiences.

16             MR. FRACKMAN:  That's what I just said.

17             MS. PRUETZ:  Not "the two," but "two."

18     BY MR. FRACKMAN:

19             Q      Two target audiences, the very young

20     girl and the tween; is that correct?

21             A      Those are the two we've talked about so

22     far.

23             Q      Are there any other Mattel target

24     audiences for Barbie?

25             A      Of course there are.
```

                                                            119

EXHIBIT 8    PG    035

1    Q        What are those?

2    A        There is the older woman, the adult,

3    anything from 19 or -- 19, 21 on up.

4    Q        Did you do any other target -- any

5    other target audiences?

6    MS. PRUETZ:  Can we put a product on this?

7    MR. FRACKMAN:  I'm just going on what's --

8    MS. PRUETZ:  Are we talking about sporting

9    goods, bed sheets, dolls?

10   BY MR. FRACKMAN:

11   Q        Whatever products are involved in your

12   analysis of No. 3, Factor No. 3 in your Valmatrix

13   analysis.  I'm just trying to find out what the word

14   there -- the words there are "target audience."

15   Okay.  Fill in the blank.

16            The target audience, as I've used it in

17   Factor No. 3 with respect to Mattel is?

18   A        The target audience, as I have used it

19   in respect to Mattel for Factor No. 3, is the tween

20   audience.

21   Q        Did you -- did you do any analysis to

22   determine what percentage of Mattel products are sold

23   to the tween audience?

24   A        I did not do that.

25   Q        Do you know what percentage of the MCA

120

1   products are sold to the tween audience?

2           A       Well, from the research and documents

3   attached here -- let me quote to you from one

4   exhibit.   Wherehouse music manager.  Quote, "The

5   funny thing about it is it's usually from little

6   kids.   I'd say between 9 and 12 years old, mostly

7   girls," unquote.  He's referring to the target

8   audience for the MCA BARBIE GIRL products.

9           Q       Did you do any analysis or research to

10  determine what percentage of the MCA BARBIE GIRL

11  product was sold to the tween audience?

12          A       I did not.

13          Q       Would you look at your Factor No. 4,

14  please, sir.   That's entitled "Same or similar

15  channels."

16                  Can you tell me what that means.

17          A       Yes.   It refers to whether the

18  infringing product, the MCA BARBIE GIRL products, are

19  found in similar or same retail outlets as those used

20  by Mattel for its Barbie-branded products.

21          Q       Which Barbie-branded products?

22          A       All Barbie-branded products.

23          Q       What, if any, research or analysis did

24  you do to score Item No. 4, "Same or similar

25  channels"?

                                                    121

1          A      Well, the -- the largest or the most

2    important retailers to Mattel, the three or four or

3    five largest retailers, which include Wal-Mart,

4    Target, and et cetera, Toys "R" Us, Price/Costco,

5    those retail outlets, those channels, are the exact

6    same channels where you can find the Mattel BARBIE

7    GIRL music products.

8          MS. PRUETZ:  You mean MCA?

9          THE WITNESS:  I'm sorry.  MCA.  I apologize.

10   MCA music products.

11   BY MR. FRACKMAN:

12         Q      First of all, how did you determine

13   that?

14         A      Well, one only has to go into a

15   Wal-Mart and go through the music department to

16   determine that.

17         Q      Did you do that?

18         A      I have been in a Wal-Mart.  I have not

19   bought a product there.

20         Q      Have you been in all those other stores

21   that you just mentioned?

22         A      Yes.  Uh-huh.

23         Q      Have you seen MCA BARBIE GIRL product

24   in each of those?

25         A      I have not seen MCA BARBIE GIRL product

                                                    122

                                              038

EXHIBIT B

1    in each store that I've been in.

2         Q    Now, you gave that a number 5.

3         A    Yes.

4         Q    That's supposed to denote complete

5    identicality, isn't it?

6         A    Complete -- yes.

7         Q    You don't mean to say that every place

8    that an MCA BARBIE GIRL record is sold a Mattel doll

9    is sold or a BARBIE GIRL product -- a Barbie product

10   is sold, do you?

11        A    No.

12        Q    And you don't mean to say that every

13   place that a Barbie -- Mattel Barbie product is sold,

14   the MCA BARBIE GIRL recording is sold, do you?

15        A    No.

16        Q    Then there isn't complete identicality,

17   is there?

18        A    No.

19        Q    Then it doesn't deserve a 5, does it?

20        A    Yes, it does.

21        Q    Then your definition you gave me this

22   morning was mistaken.

23        A    I'd have to hear you read back that

24   definition to me.  Perhaps I misspoke.

25        Q    Do you know what percentage of MCA

123

1   be sold in the music department.

2   BY MR. FRACKMAN:

3        Q      Do you know a single store, as you sit

4   here today, which had any Mattel BARBIE GIRL product,

5   Barbie product -- do you know of a single store as

6   you sit here today that had any Mattel Barbie product

7   in the same portion of the store as the MCA BARBIE

8   GIRL recording?

9        A      We haven't done that research.

10       Q      Would that be important for you to

11  know, in terms of your analysis?

12       A      Each incremental fact is always

13  helpful.

14       Q      I mean, your analysis would be

15  different if the same retail stores sold the product

16  in the same departments of the store than if they

17  sold it in different departments, wouldn't it?

18       A      Not necessarily.  Because what you're

19  concerned with here is confusion.  And if a consumer,

20  a mother or child, is walking through a Wal-Mart and

21  sees Mattel Barbie-brand product in four or five

22  different departments and also walks in the music

23  department and sees this MCA BARBIE GIRL product, the

24  typical consumer is likely to be confused as to

25  source.  Having seen Barbie product throughout the

128

EXHIBIT B                    040

```
1              A      Okay.

2              Q      -- and I just need to get an answer.

3          MS. PRUETZ:  Well, one of the problems is that

4      he's already testified about a lot of this.  And so

5      you're not using that in the preface of your

6      question.  And I think it's confusing.  He's

7      testified about empirical things he did.  So are you

8      excluding everything he testified about?

9      BY MR. FRACKMAN:

10             Q      Did you do anything empirically to

11     determine whether there was a single store where MCA

12     BARBIE GIRL product was sold in the same department,

13     that is to say, the music department, as any Mattel

14     music product?

15             MS. PRUETZ:  Other than what he's testified

16     to.

17             MR. FRACKMAN:  I don't think he's testified to

18     anything.

19             Q      But other than what you've testified

20     to.

21             A      No.

22             Q      If I told you that it never happened,

23     would you be able to contradict me in any way?

24             A      I would know with a fair degree of

25     certainty that you're probably not correct.
```

131

```
1              A      Yes.   Where are we?  I'm sorry.  Let me
2    get back to my -- okay.
3              MS. PRUETZ:  What's the question?
4    BY MR. FRACKMAN:
5              Q      Factor No. 5 was talking only about
6    advertising?
7              A      Yes.
8              Q      Did you do any analysis of what, if
9    any, radio advertising -- not promotion,
10   advertising -- MCA did in connection with the BARBIE
11   GIRL recording?
12             A      In terms of paid advertising, I do not
13   know what the budget is.
14             Q      Or did you hear any advertising spots
15   on the radio?
16             A      I have not.
17             Q      Did you see any advertisements on TV?
18             A      I have not.
19             Q      Do you know what the budget was for
20   that?
21             A      No.
22             Q      Have you compared any Mattel television
23   or radio advertising spots with any MCA advertising
24   spots?
25             A      We have not.
```

151

EXHIBIT B ... 042

1    Q    Have you compared any Mattel print

2    advertising with any MCA print advertising for the

3    BARBIE GIRL recording?

4    A    Well, we have looked -- in that case,

5    we have looked at print, because print has been

6    downloaded from the web.  And that --

7    Q    You consider that print advertising?

8    A    No, I don't.  But it's a tangible form

9    of Internet advertising.

10   Q    Well, let's talk about print

11   advertising.  What you would -- define "print

12   advertising" for me.

13   A    Classically defined as ads that appear

14   in magazines, newspapers, or other journals.

15   Q    Have you seen any MCA print advertising

16   for the BARBIE GIRL recording?

17   A    No.

18   Q    Do you know if they did any?

19   A    I don't know.

20   Q    So you obviously haven't compared any

21   with any Mattel print advertising; right?

22   A    That's correct.

23   Q    Do you know if Mattel does print

24   advertising?

25   A    Yes.

152

043

```
 1           A      I'm not sure I understand what you mean
 2     by the "association."  Apparently they've allowed
 3     someone to make child bicycle helmets.  I don't
 4     believe that dilutes the value of the Barbie -- of
 5     the Barbie trademark, just as I don't believe that
 6     the association with Ralph Lauren and Polo dilutes
 7     the value of the Barbie trademark.  In fact, the
 8     people at Ralph Lauren are enormously excited about
 9     being associated with Barbie and view it as one of
10     the most exciting things they're doing this fall.
11           Q      Good for them.
12                  Have you spoken to anybody who has told
13     you that they were confused as to the source of MCA
14     BARBIE GIRL recordings?
15           A      Have I spoken to anyone?  No.
16           Q      Have you seen anything in writing, any
17     complaints from any consumers or any documents or
18     letters from any consumers --
19           A      Well, we've had inquiries into the
20     Mattel website from clearly confused people who
21     believe that the BARBIE GIRL song that MCA and the
22     other BARBIE GIRL music products that MCA is putting
23     out --
24           Q      You're talking about the stuff that's
25     attached to the Declarations?
```

170

044

EXHIBIT B

1          A      Yes.  Uh-huh.

2          Q      Did you try to contact any of those

3    people?

4          A      No, I didn't.

5          Q      It would not have helped you to

6    understand to ask them why they were confused or if

7    they were confused to understand whether there is a

8    likelihood of confusion?  Do you think that would

9    have been a valuable aid to your determination?

10         A      We have a limited amount of time to do

11   our research, and we don't have a large enough sample

12   to contact.  It would help theoretically.

13         Q      And tell me again when you started your

14   work on this case.

15         A      Early September.

16         Q      And when did you stop?

17         A      Our Declaration had to be in, I think,

18   the 3rd of October.

19         Q      Have you done anything since then,

20   other than what we talked about getting ready for the

21   deposition?

22         A      No.

23         Q      Do you think that the association,

24   unwelcome as it may have been between -- with Barbie

25   and Trailer Trash Barbie, the Hanson case, I think it

                                              171

EXHIBIT B

1   STATE OF CALIFORNIA     )
                            )
2   COUNTY OF LOS ANGELES   )

3

4              I, Ingrid Suarez Egnatuk, CSR No. 3098,

5   a Certified Shorthand Reporter in and for the State

6   of California, do hereby certify:

7              That the foregoing deposition of WESTON

8   ANSON, VOLUME I, was taken before me pursuant to

9   Stipulation at the time and place therein set forth,

10  at which time the witness was put under oath by me;

11             That the testimony of the witness and

12  all objections made at the time of the examination

13  were recorded stenographically by me and were

14  thereafter transcribed under my direction;

15             That the foregoing is a true record of

16  the testimony and of all objections made at the time

17  of the examination.

18

19             In witness whereof, I have subscribed

20  my name this 26th day of October, 1997.

21

22

23                       Certified Shorthand Reporter
                                 No. 3098
24

25

                                                        180

EXHIBIT B

046

1　　　　　　　　　　　　　　　　PROOF OF SERVICE

2

3　　STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

4　　　　　　　I am employed in the County of Los Angeles, State of California.

5　　　　　　　I am over the age of 18 and not a party to the within action; my business
　　　address is Mitchell, Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles,
6　　California 90064.

7　　　　　　　On November 3, 1997, I served the foregoing document described as

8　　　　　　**DEFENDANTS' EVIDENTIARY OBJECTIONS TO AND MOTION TO
　　　　　　STRIKE DECLARATION OF WESTON ANSON FILED IN SUPPORT OF
9　　　　　　MATTEL, INC.'S MOTION FOR A PRELIMINARY INJUNCTION**

10　　on interested parties in this action by placing a true copy thereof which was enclosed in
　　　a sealed envelope addressed as follows:
11
　　　　　　　Adrian M. Pruetz
12　　　　　　Adam D. Samuels
　　　　　　　Quinn Emanuel Urquhart & Oliver LLP
13　　　　　　865 South Figueroa Street, 10th Floor
　　　　　　　Los Angeles, California 90017-2543
14
　　　　　　　I caused such document(s) to be hand delivered during normal business hours
15　　to the offices(s) of the addressee(s).

16　　　　　　　I am employed in the office of an attorney admitted to the bar of this Court
　　　at whose direction the service was made.
17
　　　　　　　Executed on November 3, 1997 at Los Angeles, California.
18

19

20　　　　　　　　　　　　　　　　　　　　　　　　　　　Carolyn J. Carr

21

22

23

24

25

26

27

28

Mitchell, Silberberg &
Knupp